**ATLANTIC RICHFIELD COMPANY, Appellant,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, et al.**

No. 82–2472.

United States Court of Appeals, District of Columbia Circuit.

Argued May 23, 1983.

Decided Dec. 27, 1984.

As Amended Aug. 19, 1985.

**774**

David L. Roll, Washington, D.C., with whom Richard H. Porter, Seth Goldberg, Kim Ellen Heebner and Michael B. Green, Washington, D.C., were on the brief, for appellant.

Leland Ware, Atty. Dept. of Justice, Washington, D.C., with whom J. Paul

---

\* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

**1.** The defendants, now the appellees, were the Department of Energy, the Secretary of Energy, and the Director of the Department's Office of Hearings and Appeals. We refer to them collectively as the "Department" or the "Secretary."

McGrath, Asst. Atty. Gen., Dept. of Justice, and Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, were on the brief, for appellees.

Stark Ritchie, Stephen Williams, Daniel Joseph, David A. Holzworth and Rory F. Quirk, Washington, D.C., were on the brief for amicus curiae, urging reversal.

Before SPOTTSWOOD W. ROBINSON, III, Chief Judge, WILKEY, Senior Circuit Judge, and MARKEY, Chief Judge \*.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

Senior Circuit Judge WILKEY concurs in the judgment.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

The principal questions before us are whether the Department of Energy has adjudicatory authority over alleged petroleum price-control violations, and, if so, whether, in the exercise of that authority, it can impose remedial sanctions upon parties disobeying its discovery orders.

Atlantic Richfield Company (ARCO) brought suit in the District Court for declaratory and injunctive relief from an administrative levy of discovery sanctions in two ongoing departmental proceedings.[1] The court concluded that the Department had power both to adjudicate the issues raised in those proceedings and to impose the sanctions.[2] The court dismissed the case, however, holding that ARCO's claims were not ripe for judicial review and that ARCO had not exhausted available administrative remedies.[3]

On this appeal, ARCO asserts that the Department can exercise only investigatory and prosecutorial functions, and, according-

---

**2.** *Atlantic Richfield Co. v. United States Dep't of Energy,* Civ. No. 82–3269 (D.D.C. Jan. 10, 1983) (findings of fact and conclusions of law) at 11–12, Joint Appendix (J.App.) 540–541.

**3.** *Id.* (order), J.App. 546.

ly, that it lacks authority to adjudicate asserted price-control violations. That authority, ARCO says, is conferred exclusively upon the Federal Energy Regulatory Commission by the Department of Energy Organization Act.[4] Even if the Department has some measure of implied adjudicatory power, ARCO argues, nonconformance with its discovery processes may be dealt with only by the courts. ARCO further contends that the doctrines of ripeness and exhaustion are inapposite because its challenge is not to the merits of any departmental decision, but rather to the authority of the Department to pass on allegations of price-control violations to impose the sanctions in question.

We find that ARCO's claims were ripe for judicial review and that ARCO was not required to resort to any supposed administrative remedy. We sustain, however, the Department's exertions of adjudicatory power, including the discovery sanctions involved in this case. We hold, as the District Court did, that the Secretary has received a "plenary grant" of adjudicatory authority, which extends to imposition of sanctions when necessary to "ensur[e] fairness and maintain[ ] the integrity of the [adjudicative] process."[5]

## I. THE STATUTORY SCHEME

The power of the Secretary of Energy to issue orders remediating petroleum price-control violations derives from Section 503 of the Organization Act.[6] That Act established the Department of Energy, and the Federal Energy Regulatory Commission as an independent body within the Department,[7] and transferred to the new Secretary of Energy functions theretofore performed by the Federal Energy Administration.[8] The Administration, itself the successor to the Cost of Living Council,[9] had possessed broad authority to adjudicate charged infringements of price-control regulations promulgated pursuant to the Emergency Petroleum Allocation Act of 1973,[10] which mandated pricing and allocation of crude oil, residual oil and refined petroleum.[11]

**4.** Pub.L. No. 95–91, 91 Stat. 565 (1977) (codified at 42 U.S.C. §§ 7101 *et seq.* (1982)) [hereinafter cited as codified].

**5.** *Atlantic Richfield Co. v. United States Dep't of Energy, supra* note 2, at 12, J.App. 541.

**6.** 42 U.S.C. § 7193 (1982).

**7.** *Id.* §§ 7131, 7134.

**8.** *Id.* § 7151(a).

**9.** See Federal Energy Administration Act of 1974, Pub.L. No. 93–275, § 6(b), 88 Stat. 96, 100 (codified at 15 U.S.C. §§ 761, 765(b) (1982)) [hereinafter cited as codified]; Exec.Order No. 11,790, 39 Fed.Reg. 23185 (June 27, 1974).

**10.** Pub.L. No. 93–159, 87 Stat. 628 (1973) (codified as amended at 15 U.S.C. §§ 751–760h (1982)) [hereinafter cited as codified]. Under the Economic Stabilization Act of 1970, Pub.L. No. 91–379, tit. II, § 202, 84 Stat. 799, pertinent portions of which were incorporated into the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a) (1982), the President had authority, which he delegated to the Cost of Living Council, to "issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries." This "plenary pow-

er," *University of S. Cal. v. Cost of Living Council,* 472 F.2d 1065, 1070 (Temp.Emer.Ct.App. 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), was held to encompass the Council's, and subsequently the Federal Energy Administration's, authority to issue "remedial orders." *Bonray Oil Co. v. Department of Energy,* 472 F.Supp. 899, 904 (W.D.Okla.1978), *aff'd,* 601 F.2d 1191 (Temp.Emer.Ct.App.1979). "Remedial orders" were first defined by the Council as "order[s] requiring a person to cease a violation or to take action to eliminate or to compensate for the effects of a violation, or both, or which impose[ ] other sanctions." 6 C.F.R. § 155.81(b) (1974).

**11.** These regulations expired on January 28, 1981, when the President exercised his discretionary authority, delegated by the Emergency Petroleum Allocation Act, 15 U.S.C. § 760g (1982), to terminate the petroleum price controls. See Exec.Order No. 12,287, 3 C.F.R. 124 (1982), *reprinted in* 15 U.S.C. § 757 (note) (1982). The expiration, however, did not affect "any action or pending proceedings, administrative, civil, or criminal, not finally determined on [the date of expiration], nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date," as these were expressly preserved. 15 U.S.C. § 760g (1982). See generally *United*

An important consideration in passage of the Organization Act was a perceived lack of due-process protections in petroleum-price proceedings before the Department's predecessor, the Federal Energy Administration. Regulations of the Administration specified that, if it had reason to suspect a violation, it would exercise a discretion relative to commencement of a proceeding to "determine the nature and extent of the violation."[12] Proceedings were launched by issuance of either a notice of probable violation or a notice of proposed disallowance.[13] Recipients of these notices had ten days within which to respond,[14] and after expiration of that period the Administration could issue a "remedial order,"[15] defined by the Administration's regulations as "a directive ... requiring a person to cease a violation or to eliminate or to compensate for the effects of a violation or both."[16]

Proceedings before the Administration were informal, consisting only of the pleadings and possibly a discretionary conference with Administration officials.[17] The agency had subpoena power,[18] but there were no regulations under which a recipient of a notice of probable violation or of proposed disallowance could obtain discovery respecting the agency's case. Any remedial order resulting consisted of "a written opinion setting forth the relevant facts and the legal basis" of the order,[19] and was "effective upon issuance," notwithstanding an administrative appeal.[20] Such appeals had to be filed within ten days with the Administration's Office of Exceptions and Appeals,[21] which was permitted to convene conferences or hearings in its discretion.[22] Judicial review of the decision of the Office of Exceptions and Appeals then became available in a federal district court.[23]

When the Organization Act was adopted in 1977, Congress was aware of industry complaints that this regulatory scheme was not sufficiently protective. Senator Javits, the author and Senate sponsor of the bill ultimately approved, noted that "[t]he procedure that has evolved at [the Administration] is one well-suited for emergency needs and temporary authorities, but it falls short of the due process safeguards

*States v. Uni Oil, Inc.*, 710 F.2d 1078, 1082–1084 (5th Cir.1983).

**12.** 10 C.F.R. § 205.190 (1977), amended by 44 Fed.Reg. 7922, 7924 (1978).

**13.** *Id.* §§ 205.191, 205.194, amended by 44 Fed. Reg. at 7925, 7926. When necessary, the Administration could also begin a proceeding by issuing a remedial order for immediate compliance. *Id.* § 205.193, amended by 44 Fed.Reg. at 7925.

**14.** *Id.* § 205.191(b), amended by 44 Fed.Reg. at 7925.

**15.** *Id.* § 205.192, amended by 44 Fed.Reg. at 7925. In proceedings commencing with a notice of proposed disallowance, the Administration could issue an order of disallowance. *Id.* § 205.194, amended by 44 Fed.Reg. at 7926.

**16.** *Id.* § 205.2, amended by 43 Fed.Reg. 14436, 14437 (1978).

**17.** *Id.* §§ 205.191, 205.194, amended by 44 Fed. Reg. at 7925, 7926. See also *Wentz Heating & Air Conditioning Co. v. FEA*, 410 F.Supp. 1155 (D.Neb.1976).

**18.** 15 U.S.C. § 772(e) (1982). See also Economic Stabilization Act of 1970, Pub.L. No. 91–379, tit. II, § 206, 84 Stat. 799, *as amended by* Pub.L. No. 92–210, § 206, 85 Stat. 743, 747 (1971).

**19.** 10 C.F.R. § 205.192(a) (1977), *amended by* 44 Fed.Reg. at 7925.

**20.** *Id.* § 205.192(b), amended by 44 Fed.Reg. at 7925.

**21.** *Id.* § 205.196(b), amended by 44 Fed.Reg. at 7927.

**22.** *Id.* § 205.172.

**23.** Section 5 of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1) (1982), incorporates the judicial-review provisions of § 211 of the Economic Stabilization Act, Pub.L. No. 91–379, tit. II, 84 Stat. 799 (1970), *as amended by* Pub.L. No. 92–210, § 211, 85 Stat. 743, 748–750 (1971). Under § 211(a) and (d), the district courts have "exclusive original jurisdiction" to review orders of "any agency exercising authority under this title [and] ... [n]o order of such agency [can] be enjoined or set aside, in whole or in part, unless a final judgment determines that such order [is] in excess of the agency's authority, [is] arbitrary and capricious, or [is] based upon findings which are not supported by substantial evidence." *Id.* § 211(a), (d)(1).

and separation of functions requirements included in all other permanent regulatory schemes." [24] Representative Eckhardt, the House sponsor, voiced the concern that under the Administration's "peremptory [sic] procedures," there was no way that "a person ordered to comply with a rule or regulation by a remedial order could get a hearing before the agency." [25]

To ensure that the newly-created Department of Energy would accord industry "basic procedural due process rights in agency adjudicatory proceedings," [26] Congress singled out enforcement of the Emergency Petroleum Allocation Act price-control regulations from the many unspecified "functions" of the Adminsitration reassigned to the Secretary of Energy under the general transfer clause of the Organization Act, [27] and enacted an entirely new provision governing enforcement of those regulations by the Department of Energy. It is the proper construction of that provision—Section 503 of the Organization Act [28]—that concerns us today.

## II. THE PRESENT CASE

ARCO is the respondent in two separable proceedings, now being conducted by the Department of Energy's Office of Hearings and Appeals, involving charged violations of price-control regulations. In the *Property Case*, [29] the agency has alleged that ARCO classified certain of its crude-oil-producing properties in a prohibited manner, resulting in unlawful enrichment in the amount of some $42 million. In the *Affiliate Transfer Case*, [30] the allegation is that ARCO overstated by more than $49.5 million its cost for imported crude oil purchased from foreign affiliates.

In each proceeding, one of the defenses asserted by ARCO is good-faith reliance upon its interpretation of the applicable regulations. The parties have engaged in discovery, and the agency's prosecutorial arm, the Economic Regulatory Administration, has sought evidence concerning ARCO's "corporate state of mind" regarding those regulations. ARCO resisted production of some of the requested documents, asserting the attorney-client and work-product privileges.

In both proceedings, the Office of Hearings and Appeals granted motions by the Economic Regulatory Administration seeking to effectuate discovery. [31] The order in

24. 123 Cong.Rec. 15281 (1977). See also *id.* at 15297 (1977) (remarks of Senator Stone) ("[w]ith the transition from a short-term administrative agency to a permanent, cabinet-level Department of Energy ..., the Department must accept the responsibility of insuring administrative due process rights by affording a full and complete hearing on the record in Department adjudicatory hearings").

ARCO advances language from the legislative history to the effect that one of the purposes of § 503 is to separate the functions of prosecutor and adjudicator. H.R.Rep. No. 539, 95th Cong., 1st Sess. 85 (1977), U.S.Code Cong. & Admin. News 1977, 854. This language reaffirms the already-evident fact that a primary congressional concern was due process. Although it also supports the view that the Department is to act as prosecutor and the Commission as adjudicator when departmental decisions are on administrative appeal, it does not impinge on the idea of a two-level adjudicatory system.

25. 123 Cong.Rec. 17402 (1977).

26. *Id.* at 17403 (remarks of Representative Conte).

27. "Except as otherwise provided in this chapter, there are transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration ...; and the functions vested by law in the officers and components of ... such Administration." 42 U.S.C. § 7151(a) (1982).

28. 42 U.S.C. § 7193 (1982).

29. *Atlantic Richfield Co.*, No. DRO–0193 (Office of Hearings and Appeals) (filed May 1, 1979) [hereinafter cited as *Property Case*].

30. *Atlantic Richfield Co.*, No. BRO–1243 (Office of Hearings and Appeals) (filed May 15, 1980) [hereinafter cited as *Affiliate Transfer Case*].

31. The motions were made pursuant to 10 C.F.R. § 205.198(h)(1) (1984), which provides that "[i]f a person fails to comply with an order relating to discovery, the Office of Hearings and Appeals may order appropriate sanctions."

the *Property Case*[32] stated that unless ARCO produced the sought-after materials, it would be precluded from relying upon any affirmative defense placing its corporate state of mind in issue.[33] An order granting the Administration's motion for sanctions in the *Affiliate Transfer Case*,[34] while not barring any of ARCO's defenses, permitted inferences adverse to those defenses to be drawn.[35]

ARCO then inaugurated this litigation in the District Court for declaratory and injunctive relief. After briefing and argument, the court denied ARCO the injunction requested and granted the Department's motion to dismiss.[36] This appeal then ensued.[37]

### III. JURISDICTION OF THE APPEAL

At the threshold, the Department of Energy argues that, because this case presents issues arising under both the Economic Stabilization Act and Emergency Petroleum Allocation Act, an appeal may be taken only to the Temporary Emergency Court of Appeals (TECA). That court has exclusive jurisdiction of "all appeals from the district courts of the United States in cases and controversies arising under" those two Acts, "or under regulations or orders issued thereunder."[38] That jurisdiction, however, is limited to the *issues* arising directly under those statutes;[39] an appeal raising such issues but also other issues must be bifurcated.[40] The underlying controversy—here, alleged violations of the Emergency Petroleum Allocation Act's price-control regulations—is "not determinative of jurisdiction."[41] What is essential to TECA's jurisdiction is that the issue presented on appeal involve the construction, applicability or effect of either the Economic Stabilization Act or the Emergency Petroleum Allocation Act, and that the

---

**32.** *Office of Special Counsel*, 10 D.O.E. ¶ 84,014 (1982), J.App. 209–217.

**33.** *Id.* at 5, J.App. 213.

**34.** *Office of Special Counsel*, 10 D.O.E. ¶ 82,553 (1983), J.App. 624–638.

**35.** *Id.* at 10, J.App. 633.

**36.** *Atlantic Richfield Co. v. United States Dep't of Energy, supra* note 2, J.App. 530–546.

**37.** This court denied ARCO's motion for an injunction pending appeal, *Atlantic Richfield Co. v. United States Dep't of Energy*, No. 82–2472 (D.C.Cir. Jan. 14, 1983) (order).

**38.** Economic Stabilization Act of 1970, Pub.L. No. 91–379, tit. II, 84 Stat. 799, *as amended by* Pub.L. No. 92–210, § 211(b)(2), 85 Stat. 743, 749 (1971). See also 15 U.S.C. § 754(a)(1) (1982). TECA was created to hear and decide appeals from district courts in cases arising under the Economic Stabilization Act, Pub.L. No. 91–379, tit. II, 94 Stat. 799, *as amended by* Pub.L. No. 92–210, § 211(b)(2), 85 Stat. 743, 749 (1971). The Emergency Petroleum Allocation Act incorporated the exclusive-review provision. 15 U.S.C. § 754(a)(1) (1982).

**39.** *United States v. Hill*, 224 U.S.App.D.C. 138, 140 n. 5, 694 F.2d 258, 260 n. 5 (1982). See also *Scallop Corp. v. Tully*, 705 F.2d 645 (2d Cir. 1983); *Coastal States Mktg. Inc. v. New Eng. Petroleum Corp.*, 604 F.2d 179, 187 (2d Cir.

1979); *Francis Oil & Gas, Inc. v. Exxon Corp.*, 687 F.2d 484, 487 (Temp.Emer.Ct.App.), *cert. denied*, 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982); *Texaco, Inc. v. Department of Energy*, 616 F.2d 1193, 1198 (Temp.Emer.Ct.App. 1979).

**40.** *Scallop Corp. v. Tully, supra* note 39, 705 F.2d at 650; *Mobil Oil Corp. v. Tully*, 639 F.2d 912 (2d Cir.), *cert. denied*, 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981); *Coastal States Mktg, Inc. v. New Eng. Petroleum Corp., supra* note 39, 604 F.2d at 185–187; *Texaco, Inc. v. Department of Energy, supra* note 39, 616 F.2d at 1196–1197 and cases cited therein. See also *Municipal Elec. Util. Ass'n v. FPC*, 158 U.S.App. D.C. 188, 485 F.2d 967 (1973). Since ARCO has also appealed the District Court's judgment to TECA, where that appeal is being held in abeyance pending disposition of the instant appeal, ARCO suffers no prejudice from bifurcation of the issues by this court. Like the Second Circuit, we approve the practice of filing protective appeals in both TECA and the court of appeals for the appropriate circuit. See *Coastal States Mktg., Inc. v. New Eng. Petroleum Corp., supra*, 604 F.2d at 186 n. 9.

**41.** *United States v. Hill, supra* note 39, 224 U.S. App.D.C. at 140 n. 5, 694 F.2d at 260 n. 5; *MGPC, Inc. v. Department of Energy*, 673 F.2d 1277, 1281 (Temp.Emer.Ct.App.1982); *Gulf Oil Corp. v. United States Dep't of Energy*, 639 F.2d 766, 767 (Temp.Emer.Ct.App.1981).

case have been decided by the district court on that basis.[42]

■ The 1977 Organization Act made no provision for appeals to TECA, and TECA itself has held that it has no jurisdiction over issues arising solely under that legislation.[43] While TECA's jurisdiction does extend to exercises by the Department of Energy of powers previously conferred by the Economic Stabilization Act or the Emergency Petroleum Allocation Act on predecessor agencies and transferred to the Department by the Organization Act, it has no jurisdiction over questions that involve an interpretation or application of the Organization Act itself.[44]

The adjudicatory procedures at issue here, including the sanctions regulation,[45] were prescribed by the Department with an express but indiscriminate reference to the authority given the Department by all three statutes: the Economic Stabilization Act, the Emergency Petroleum Allocation Act and the Department of Energy Organization Act.[46] The particular source of the Department's authority to act in any given case depends upon the date on which

that case was commenced. By its express terms, Section 503 of the Organization Act, which pertains to adjudication of remedial orders, applies only to "proceedings initiated by a notice of probable violation issued after October 1, 1977." [47] Proceedings begun before October 1, 1977, are necessarily governed by the preexisting statutes.[48]

■ The question whether the Department has authority to adjudicate the *Affiliate Transfer Case* arises under the Emergency Petroleum Allocation Act, and thus is within the exclusive jurisdiction of TECA. That case is being prosecuted pursuant to powers previously conferred by the Emergency Petroleum Allocation Act on the Federal Energy Administration and subsequently transferred to the Department by the Organization Act. A notice of proposed disallowance, the functional analogue of a notice of probable violation,[49] was issued therein during April, 1977. Since the *Affiliate Transfer Case* arose solely under prior Administration authority, TECA has exclusive jurisdiction over all questions as to the validity of the Depart-

---

**42.** *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1382 (10th Cir.1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979). See also *Scallop Corp. v. Tully, supra* note 39, 705 F.2d at 647; *Mobil Oil Co. v. Tully, supra* note 40, 639 F.2d at 915; *United States v. Wyatt*, 680 F.2d 1080, 1083 (5th Cir.1982). Once jurisdiction is properly assumed over an issue arising under the Economic Stabilization Act or the Emergency Petroleum Allocation Act, TECA has power "to resolve those subsidiary, procedural and threshold questions—such as mootness, standing and ripeness—that are incidental to questions that are within [its] jurisdiction, because the power to do so is normal and necessary to the functioning of any appellate court." *MGPC, Inc. v. United States Dep't of Energy, supra* note 41, 673 F.2d at 1281. See also *Quincy Oil, Inc. v. Federal Energy Admin.*, 620 F.2d 890, 893 (Temp.Emer.Ct.App.1980); *United States Dep't of Energy v. Crocker*, 629 F.2d 1341 (Temp.Emer.Ct.App.1980) (per curiam).

**43.** *Texaco, Inc. v. Department of Energy, supra* note 39, 676 F.2d at 1196.

**44.** *Id.* See also *MGPC, Inc. v. United States Dep't of Energy, supra* note 41, 673 F.2d at 1280–1281.

**45.** See note 31 *supra.*

**46.** 10 C.F.R. § 205.198(h)(1) (1984).

**47.** 42 U.S.C. § 7193(f) (1982).

**48.** The Conference Report to the Organization Act stated expressly that "all Notice of Probable Violations issued and outstanding on the effective date of the act should be completed without regard to the new statutory requirements." H.R.Rep. No. 539 (Conf.), 95th Cong., 1st Sess. 85 (1977) [hereinafter cited as Conference Report], U.S.Code Cong. & Admin.News 1977, 956.

**49.** Enforcement proceedings may be "commence[d] ... by serving a Notice of Probable Violation, a Notice of Probable disallowance, a Proposed Remedial Order, a Proposed Order of Disallowance, or an Interim Remedial Order for Immediate Compliance." 10 C.F.R. § 205.-190(b) (1984). See also *id.* §§ 205.191(a), 205.-199E(a). Contrary to ARCO's contention, the addition by the Department of proposed remedial orders and proposed orders of disallowance to preexisting enforcement mechanisms does not dishonor congressional intent to bar application of § 503 to cases wherein a notice of probable violation or notice of proposed disallowance was filed *before* the passage of the Organization Act.

ment's procedures utilized in that case.[50] The mere transfer of Administration functions to the Department by the Organization Act does not create an issue under the Organization Act.[51] Rather, ARCO's claims in the *Affiliate Transfer Case* implicate only the construction, applicability or effect of the Economic Stabilization Act and Emergency Petroleum Allocation Act.[52]

■ By contrast, the validity of the Department's action in the *Property Case* is a question arising exclusively under the Organization Act, and thus is beyond TECA's jurisdiction. That case was commenced by issuance of a proposed remedial order on May 1, 1979,[53] well after the effective date of the Organization Act.[54] This legislation erected an entirely new scheme of enforcement of price-control regulations, entirely independent of the preexisting statutory framework within which the Federal Energy Administration functioned under the Economic Stabilization and Emergency Petroleum Allocation Acts.[55] The scope of the Secretary's authority under Section 503 of the Organization Act is an issue arising solely under the Act; it does not involve the construction, application or effect of either of the other two. We, not TECA, have jurisdiction to consider and decide ARCO's contentions insofar as they pertain to the *Property Case*.[56]

IV. RIPENESS AND EXHAUSTION

■ The District Court held that the validity of the imposition by the Office of Hearings and Appeals of discovery sanctions was not ripe for review,[57] and that ARCO had failed to exhaust its administrative remedies.[58] The court noted that the two pending proceedings concerned proposed remedial orders, that no final order had issued in either, and that the agency's investigations might lead to findings of no reason to believe that any remedial order should issue at all.[59] The court observed that "[o]rders for sanctions are at best interlocutory," [60] and as such not subject to judicial review "[e]xcept in extraordinary circumstances." [61] Were ARCO attacking the merits of the administrative decisions to impose discovery sanctions, we might agree with the District Court that ARCO's action was premature.[62] What ARCO is

---

**50.** See note 38 *supra.*

**51.** *MGPC, Inc. v. United States Dep't of Energy, supra* note 41, 673 F.2d at 1280–1281; *Texaco, Inc. v. Department of Energy, supra* note 39, 616 F.2d at 1196.

**52.** ARCO claims that the District Court did not "adjudicate" any issue implicating either the Economic Stabilization Act or the Emergency Petroleum Allocation Act, but instead sustained the Department's procedures on the basis of the Organization Act alone. Although the court did not specifically differentiate between pre-Organization Act and post-Organization Act powers and functions, it did adjudicate ARCO's claims with regard to both time periods. Jurisdiction was premised on all three acts, *Atlantic Richfield Co. v. United States Dep't of Energy, supra* note 2, at 8, J.App. 537, and the court specifically found that the *Affiliate Transfer Case, supra* note 30, was "commenced in May of 1977" and the *Property Case, supra* note 29, in May, 1979. *Id.* at 6, J.App. 535. Thus, the court's ruling is consistent with our jurisdictional disposition.

**53.** A notice of probable violation is not a prerequisite to issuance of a proposed remedial order. 10 C.F.R. § 205.192(b) (1984).

**54.** See note 4 *supra.*

**55.** See text *supra* at notes 26–28.

**56.** ARCO's challenge to the Department's power to establish adjudicatory procedures applicable to post-Organization Act proceedings is jurisdictionally very different from a challenge to the agency's construction or application of those regulations. Were ARCO simply contesting a discovery sanction overriding its claims of privilege—with no challenge to the agency's power to impose that sanction—the question would clearly be within TECA's appellate jurisdiction as incidental to the underlying enforcement proceeding. See text *supra* at note 42.

**57.** *Atlantic Richfield Co. v. United States Dep't of Energy, supra* note 2, at 10, J.App. 539.

**58.** *Id.* at 9, J.App. 538.

**59.** *Id.*

**60.** *Id.* at 10, J.App. 539.

**61.** *Id.*

**62.** At least in civil actions, discovery orders under Fed.R.Civ.P. 37, barring "extraordinary circumstances," are not subject to interlocutory

challenging, however, is the very power of the Department of Energy to issue remedial orders and to levy such sanctions. For the reasons that follow, we conclude that ARCO's claims were not barred by the exhaustion doctrine, and were ripe for judicial review.[63]

## A. Exhaustion

 As a general rule, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."[64] It has consistently been recognized, however, that the exhaustion requirement is "not inflexible,"[65] and must be applied with "an understanding of its purposes and of the particular administrative scheme involved."[66] Where, as here, the goals of this requirement cannot possibly be achieved, there obviously is no need for exhaustion.[67]

The primary objective of the exhaustion doctrine is promotion of administrative and judicial efficiency by avoiding "premature interruption of the administrative process."[68] Exhaustion of available administrative remedies allows the agency to apply its expertise, discover and correct its errors, and build a factual record to enable judicial review.[69] Exhaustion discourages

review. See, e.g., *Donnelly v. Parker,* 158 U.S. App.D.C. 335, 341, 486 F.2d 402, 408 (1973); *International Business Machs. Corp. v. United States,* 493 F.2d 112, 114–115, 117 (2d Cir.1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). Accord, *In re Attorney Gen. of the United States,* 596 F.2d 58, 61–62 (2d Cir.), cert. denied, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979); *Southern Ry. v. Lanham,* 403 F.2d 119, 124 (5th Cir.1968); *SEC v. Naftalin,* 460 F.2d 471, 475 (8th Cir.1972). We note also that the Department's regulations provide that "[a]ny order issued by the Office of Hearings and Appeals with respect to discovery shall be subject to further administrative review or appeal only upon issuance of the [remedial order]." 10 C.F.R. § 205.198(i) (1984).

63. The Department argues that independently of the court-made doctrines of ripeness and exhaustion, there is a statutory bar. Section 503(c) of the Organization Act states that an order issued by the Federal Energy Regulatory Commission on appeal from a remedial order by the Department "shall, for the purpose of judicial review, constitute a final agency action." 42 U.S.C. § 7193(c) (1982). The Department contends that this provision precludes judicial review of action by the Office of Hearings and Appeals unless and until that action is appealed to the Commission and it announces a final decision. We have, however, expressly rejected that construction of the Act. *Gulf Oil Corp. v. United States Dep't of Energy,* 214 U.S. App.D.C. 119, 133, 663 F.2d 296, 310 (1981). See also *Department of Energy v. Louisiana,* 690 F.2d 180, 185–186 (Temp.Emer.Ct.App.1982), cert. denied, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *Texaco, Inc. v. Department of Energy,* 490 F.Supp. 874, 884–885 (D.Del. 1980).

64. *Myers v. Bethlehem Shipbldg. Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638, 644 (1938). See also *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n,* 228 U.S.App.D.C. 80,

707 F.2d 1485 (1983); *Lodge 1858, Am. Fed'n of Gov't Employees v. Paine,* 141 U.S.App.D.C. 152, 166 & n. 86, 436 F.2d 882, 896 & n. 86 (1970); *SEC v. R.A. Holman & Co.,* 116 U.S.App.D.C. 279, 281, 323 F.2d 284, 287, cert. denied, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963).

65. *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 83, 707 F.2d at 1488, quoting *Association of Nat'l Advertisers, Inc. v. FTC,* 201 U.S.App.D.C. 165, 170, 627 F.2d 1151, 1156 (1979), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). See also *Fitzgerald v. Hampton,* 152 U.S.App. D.C. 1, 14–15, 467 F.2d 755, 768–769 (1972); *Sterling Drug, Inc. v. FTC,* 146 U.S.App.D.C. 237, 249–250, 450 F.2d 698, 710–711 (1971).

66. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969). See also *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522, 538 (1975); *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17, 25 (1972).

67. *Weinberger v. Salfi, supra* note 66, 422 U.S. at 765–766, 95 S.Ct. at 2466–2467, 45 L.Ed.2d at 538–539; *McKart v. United States, supra* note 66, 395 U.S. at 193, 89 S.Ct. at 1662, 23 L.Ed.2d at 203; *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 83, 707 F.2d at 1488.

68. *McKart v. United States, supra* note 66, 395 U.S. at 193, 89 S.Ct. at 1662, 23 L.Ed.2d at 203. See also *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 83, 707 F.2d at 1488; *Sterling Drug, Inc. v. FTC, supra,* note 65, 146 U.S.App.D.C. at 249, 450 F.2d at 710.

69. See generally *McKart v. United States, supra* note 66, 395 U.S. at 194–195, 89 S.Ct. at 1662–1663, 23 L.Ed.2d at 203–204; *Athlone Indus.,*

the "frequent and deliberate flouting of administrative processes [which] could weaken the effectiveness of an agency,"[70] and "increas[es] the possibility that no judicial decision will be necessary, since the complaining party's rights may ultimately be vindicated at the agency level."[71]

Recently, we held that the purposes of the exhaustion requirement would not be significantly advanced by postponing judicial consideration of a challenge to the authority of the Consumer Products Safety Commission to assess civil penalties in an administrative proceeding.[72] Our reasoning there applies equally to ARCO's assault on the power of the Department of Energy to adjudicate questions concerning remedial orders and impose discovery sanctions in the course of that adjudication. The scope of the Secretary's statutory authority is strictly a legal issue, and "[n]o factual development or application of agency expertise will aid the court's decision."[73] Additionally, because we are "relatively more expert" to ascertain the meaning of statutory terms,[74] we would not impermissibly displace agency skill or invade the field of agency discretion.

Moreover, exhaustion is not required where, as here, it is "highly unlikely that the [agency] would change its position if the case were remanded to it."[75] The Department has structured its regulatory processes on the premise that it has power to act in an adjudicatory capacity. It has rejected ARCO's attempts to emasculate that power,[76] and has successfully defended the power before the Federal Energy Regulatory Commission in remedial-order proceedings.[77] As we have heretofore observed, "[w]hen resort to the agency would in all likelihood be futile, the cause of overall efficiency will not be served by postponing judicial review, and the exhaustion requirement need not be applied."[78]

## B. *Ripeness*

Moving on to the Department's contention that the issues tendered by ARCO are not ripe for review, we bear in mind the Supreme Court's teaching that

[the] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract

---

*Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 83, 707 F.2d at 1488; *Sterling Drug, Inc. v. FTC, supra* note 65, 146 U.S.App.D.C. at 249, 450 F.2d at 710.

70. *McKart v. United States, supra* note 66, 395 U.S. at 195, 89 S.Ct. at 1663, 23 L.Ed.2d at 204.

71. *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 83, 707 F.2d at 1488. See also *McKart v. United States, supra* note 66, 395 U.S. at 195, 89 S.Ct. at 1663, 23 L.Ed.2d at 204; *Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 81, 518 F.2d 466, 474 (1975); *Sterling Drug, Inc. v. FTC, supra* note 65, 146 U.S.App.D.C. at 249, 450 F.2d at 710.

72. *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 83–84, 707 F.2d at 1488–1489.

73. *Id.* at 84, 707 F.2d at 1489. See also *McKart v. United States, supra* note 66, 395 U.S. at 199, 89 S.Ct. at 1665, 23 L.Ed.2d at 206; *Association of Nat'l Advertisers, Inc. v. FTC, supra* note 65, 201 U.S.App.D.C. at 179, 627 F.2d at 1157; *Committee for GI Rights v. Callaway, supra* note 71, 171 U.S.App.D.C. at 81, 518 F.2d at 474.

74. *Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192, 199 (1970), quoting *Hardin v. Kentucky Utils. Co.,* 390 U.S. 1, 14, 88 S.Ct. 651, 659, 19 L.Ed.2d 787, 797 (1968) (dissenting opinion). See also *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 84, 707 F.2d at 1489.

75. *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 84, 707 F.2d at 1489.

76. *Office of Special Counsel,* 10 D.O.E. ¶ 82,553 (1983), J.App. 629–630.

77. See, e.g., *Mobil Oil Corp.,* No. RO79–9, Energy Mgmt. (CCH) ¶ 46,064 (proposed order of presiding officer) (Apr. 2, 1980), *aff'd, id.* at ¶ 46,092 (Aug. 7, 1980).

78. *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 84, 707 F.2d at 1489; *Committee for GI Rights v. Callaway, supra* note 71, 171 U.S.App.D.C. at 81 n. 20, 518 F.2d at 474 n. 20; *Lodge 1858, Am. Fed'n of Gov't Employees v. Paine, supra* note 64, 141 U.S.App.D.C. at 166, 436 F.2d at 896; *Dooley v. Ploger,* 491 F.2d 608, 614–615 (4th Cir.1974).

disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a two-fold aspect, requiring [courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.[79]

This approach "in essence requires the court to balance its interest in deciding the issue in a more concrete setting against the hardship to the parties caused by delaying review."[80] An issue is "fit for judicial resolution," under the first prong of the ripeness inquiry, if it is "essentially legal" and the agency action is "sufficiently final."[81] The question whether the Department of Energy has statutory authority to adjudicate price-control controversies and to impose discovery sanctions clearly meets this test. Neither a price-control violation nor a discovery sanction is before us on the merits. We have no need for a particularized factual record to assist us in deciding the only issue presented: the scope of the Department's statutory powers in the two foregoing respects. Questions of statutory interpretation are the day-to-day business of the courts.

The administrative action here under attack is sufficiently final for review. The Department has promulgated a regulation providing for imposition of the contested sanctions in appropriate cases.[82] And, by subjecting ARCO to adjudicatory proceedings, the Department has, "for all practical purposes, made a final determination that such proceedings [are] within its statutory jurisdiction."[83]

Whether ARCO's charges are sufficiently serious under the "hardship to the parties" criterion to warrant immediate review depends upon the "totality of [the] circumstances,"[84] and those here plainly justify review of ARCO's charges at this time. ARCO has made substantial allegations of fundamental structural flaws in the administrative scheme of adjudicating controversies over petroleum price-control violations. While the questions presented are not exactly of judicial first impression,[85] they indubitably are of considerable public importance. ARCO already has been faced with the dilemma of having to chose between complying with allegedly ultra vires discovery orders—and thus revealing materials that otherwise would remain confidential—and flouting the orders and facing the consequences should the Department ultimately be found to have had the power to

79. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967).

80. *Webb v. Department of Health & Human Servs.*, 225 U.S.App.D.C. 19, 24, 696 F.2d 101, 106 (1982).

81. *Gulf Oil Corp. v. United States Dep't of Energy, supra* note 63, 214 U.S.App.D.C. at 133, 663 F.2d at 310 (emphasis omitted). In determining whether an order is "sufficiently final" for this purpose, "the relevant considerations ... are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203, 210 (1970).

82. 44 Fed.Reg. 7924 (1979) (codified at 10 C.F.R. § 205.198(h)(1) (1984)).

83. *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, supra* note 64, 228 U.S.App.D.C. at 84–85 n. 30; 707 F.2d at 1489–1490 n. 30.

84. *Gulf Oil Corp. v. United States Dep't of Energy, supra* note 63, 214 U.S.App.D.C. at 136, 663 F.2d at 313.

85. A similar case, challenging the validity of the Department's Subpart O regulations, 10 C.F.R. §§ 205.190–205.199 (1984), was until recently pending in the District of Wyoming. *True Oil Co. v. Department of Energy*, Civ. No. C81–0391B (D.Wyo.). The Department's motion to dismiss on ripeness and exhaustion grounds was denied. *True Oil Co. v. Department of Energy*, 4 Energy Mgmt. (CCH) ¶ 26,405 (D.Wyo. 1982). The case was subsequently dismissed pursuant to stipulation of the parties.

issue the orders.[86] There is no satisfactory assurance that ARCO will not have to face that dilemma again.[87] Moreover, at stake is not only the asserted jeopardy of ARCO's rights, but also the validity of the initial stage of the petroleum price-control enforcement effort. There has been uncertainty as to the Department's power to adjudicate remedial orders ever since passage of the Organization Act,[88] and the public interest would hardly be served by further delaying judicial resolution of the question.

■■■■■■ For these weighty reasons, we hesitate to postpone review further. We realize, of course, that the time and ex-

pense of litigation does not normally justify interlocutory review.[89] Yet, as it aptly has been said, those outlays are "not a burden we should impose too blithely." [90] And, given the grave questions as to the legality of the Department's procedures, the strong public interest in early resolution of those questions, and the impossibility of finally settling them administratively, our decision to proceed will not require effort to be "expended in vain, without any compensating clarification of the issue." [91] On balance, we find the issues of the Department's statutory power to adjudicate remediation for price-control violations, and to impose discovery sanctions in the course thereof, ripe for judicial review.[92]

**86.** See *Abbott Laboratories v. Gardner, supra* note 79, 387 U.S. at 152, 87 S.Ct. at 1517, 18 L.Ed.2d at 693.

**87.** See note 92 *infra*.

**88.** A report by the Senate Subcommittee on Energy Conservation and Regulation of the Senate Committee on Energy and Natural Resources, issued less than a year after the effective date of the Act, noted the problem and declined to "render[ ] any judgment as to the legality of adjudicating remedial orders in the Office of Hearings and Appeals." S.Rep. No. 967, 95th Cong., 2d Sess. 185 (1978). Declaring that a double adjudication is "an unnecessarily inefficient process," and that accordingly the Office of Hearings and Appeals "should not adjudicate remedial orders," *id.*, the Subcommittee nonetheless "adopt[ed] the President's fiscal year 1979 funding request for the adjudication of remedial orders within the Office of Hearings and Appeals." *Id.* at 186. Even though the Subcommittee indicated that funding for such adjudications would not be approved for subsequent years, stating that "[b]eginning in 1980 and thereafter this function will be assigned to the FERC," *id.* at 186, it appears that Congress has subsequently approved funding requests for the Office. See, e.g., 128 Cong.Rec.S. 14277, 14298–14299 (daily ed. Dec. 9, 1982) (explanatory statement of the recommendations of the Senate Committee on Appropriations respecting the Department of the Interior and other agencies). Our holding in Part VI *infra* makes it unnecessary to reach Department's contention that regardless of whether it was originally empowered by the Act to adjudicate remedial orders, Congress ratified such activities by subsequent appropriations.

**89.** See, e.g., *FTC v. Standard Oil Co.,* 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416, 427 (1980); *Renegotiation Bd. v. Bannercraft Cloth-*

*ing Co.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 1040, 39 L.Ed.2d 123, 139 (1974).

**90.** *West v. Bergland,* 611 F.2d 710, 720 (8th Cir. 1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).

**91.** *Id.*

**92.** After submission of this case, the Department's Office of Hearings and Appeals concluded that a remedial order should issue against ARCO in the *Property Case. Property Case, supra* note 29 (Mar. 22, 1984). The agency stated that it did not make any findings adverse to ARCO because of the latter's refusal to comply with the discovery order, *id.* at 135–137, and on this ground the Department argues that the *Property Case* is now moot. We do not agree. One of ARCO's principal contentions is that the Department is wholly without power to promulgate a remedial order predicated upon price-control adjudication, and surely the case is not moot with respect to this issue. Nor can we say that the controversy over the discovery sanction, see text *supra* at note 33, has lost its vitality. As we recently pointed out,

[t]wo conditions ... must be satisfied if a federal court is to dismiss a case as moot. First, the court must conclude "with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur" ... [and] second, ... it must be plain that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."

*Doe v. Harris,* 225 U.S.App.D.C. 27, 29, 696 F.2d 109, 111 (1982), quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642, 649 (1979) (citations omitted). The Department makes no effort to show that resort to a similar discovery order is unlikely in other ongoing departmental enforcement pro-

## V. AUTHORITY TO ADJUDICATE REMEDIAL ORDERS

■ ARCO asserts that Section 503 of the Organization Act confines the Secretary of Energy, and thus the Department of Energy, to the executive functions of investigating and prosecuting possible violations of the petroleum price-control regulations, and that all adjudicatory power in this area is vested in the Federal Energy Regulatory Commission. The Department, on the other hand, contends that Section 503 grants the Secretary plenary power to decide the questions whether in particular instances the regulations have been violated and, if so, whether a remedial order should issue. After consideration of the statutory language, its legislative history and analogous statutory schemes, and giving due deference to the agency's construction, we conclude that the Department has authority to adjudicate those issues.

### A. The Statutory Text

We begin with the words of Section 503.[93] We view its entire text,[94] but the

ceedings against ARCO. Moreover, ARCO asserts, without contradiction by the Department, that the effects of the sanctioning order already issued in the *Property Case* have not been "irrevocably eradicated." Letter from David L. Roll, counsel for ARCO, to George A. Fisher, Clerk, at 3 (Apr. 10, 1984). The burden was on the Department to demonstrate mootness, *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642, 649 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–633, 73 S.Ct. 894, 897–898, 97 L.Ed. 1303, 1309 (1953), and this the Department has not done.

93. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766, 772 (1980) ("the starting point for interpreting a statute is the language of the statute itself"); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668, 679 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539, 551 (1975).

94. Section 503 of the Department of Energy Reorganization Act, 42 U.S.C. § 7193 (1982), states:

*Remedial orders. (a) Violations of rules, regulations, or orders promulgated pursuant to Emergency Petroleum Allocation Act of 1973*

If upon investigation the Secretary or his authorized representative believes that a person has violated any regulation, rule, or order described in section 7191(a) of this title promulgated pursuant to the Emergency Petroleum Allocation Act of 1973 [15 U.S.C. § 751 *et seq.*], he may issue a remedial order to the person. Each remedial order shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of such rule, regulation, or order alleged to have been violated. For purposes of this section "person" includes any individual, association, company, corporation, partnership, or other entity however organized.

(b) *Notice of intent to contest; final order not subject to review*

If within thirty days after the receipt of the remedial order issued by the Secretary, the person fails to notify the Secretary that he intends to contest a remedial order, the remedial order shall become effective and shall be deemed a final order of the Secretary and not subject to review by any court or agency.

(c) *Notice of contestation to Commission; stay; hearing; cross examination; final order; enforcement and review*

If within thirty days after the receipt of the remedial order issued by the Secretary, the person notifies the Secretary that he intends to contest a remedial order issued under subsection (a) of this section, the Secretary shall immediately advise the [Federal Energy Regulatory] Commission of such notification. Upon such notice, the Commission shall stay the effect of the remedial order, unless the Commission finds the public interest requires immediate compliance with such remedial order. The Commission shall, upon request, afford an opportunity for a hearing, including, at a minimum, the submission of briefs, oral or documentary evidence, and oral argument. To the extent that the Commission in its discretion determines that such is required for a full and true disclosure of the facts, the Commission shall afford the right of cross examination. The Commission shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's remedial order, or directing other appropriate relief, and such order shall, for the purpose of judicial review, constitute a final agency action, except that enforcement and other judicial review of such action shall be the responsibility of the Secretary.

(d) *Time limits*

The Secretary may set reasonable time limits for the Commission to complete action on a proceeding referred to it pursuant to this section.

(e) *Effect on procedural action taken by Secretary prior to issuance of initial remedial order*

Nothing in preceding provisions of this section shall be construed to affect any procedur-

nature of our inquiry requires that it be carefully parsed. To be sure, there is some language supporting ARCO's position that the Secretary is restricted to investigation and prosecution of alleged price-control violations, and that the adjudicatory power is vested wholly in the Commission. A remedial order is to issue "upon investigation" and when the Secretary "believes"—not finds—that there is a violation.[95] The order must "describe with particularity" the nature of the violation, and refer specifically to each rule, regulation or order· "alleged" to be violated.[96] If not contested within 30 days, the order becomes final and "not subject to review by any court or agency,"[97] but any contest is to be heard and determined by the Federal Energy Regulatory Commission.[98] Section 503 mentions only one hearing—that before the Commission—and provides procedural safeguards common to trials, not appellate proceedings.[99] That a claimant turns to the Commission to "contest" a remedial order[100] also seems to suggest a trial-type proceeding rather than an appeal. It is the Commission that has express statutory

power to "stay" the remedial order, to "determine[ ]" whether cross-examination is required, and to make "findings of fact"[101]—all typical adjudicatory functions.

On the other hand, it is also clear from the language of Section 503 that the remedial order spoken of is far more than a mere complaint, prosecutorial document or investigatory report. Unlike a complaint, a remedial order, by the express terms of the section, is final, self-executing and unreviewable if not contested within 30 days;[102] because that is so, the Commission must "stay" the effect of the order if it is challenged.[103] A complaint, by contrast, presents no occasion for a stay because it is simply an accusation, without effect absent further action. After proceedings before the Commission, it issues an order "affirming, modifying, or vacating" the remedial order;[104] these words connote appellate review of a prior adjudication. In making the initial decision, the Secretary is prohibited from issuing a remedial order if its subject "relied in good faith" on some preexisting agency interpretation of the regulations alleged to have been violated.[105]

al action taken by the Secretary prior to or incident to initial issuance of a remedial order which is the subject of the hearing provided in preceding provisions of this section, but such procedures shall be reviewable in the hearing.

(f) *Savings provision*

The provisions of preceding provisions of this section shall be applicable only with respect to proceedings initiated by a notice of probable violation issued after October 1, 1977.

(g) *Retroactive application; marketing of petroleum products* .

With respect to any person whose sole petroleum industry operation relates to the marketing of petroleum products, the Secretary or any person acting on his behalf may not exercise discretion to maintain a civil action (other than an action for injunctive relief) or issue a remedial order against such person for any violation of any rules or regulations if—

(1) such civil action or order is based on a retroactive application of such rule or regulation or is based upon a retroactive interpretation of such rule or regulation; and

(2) such person relied in good faith upon rules, regulations, or ruling in effect on the date of the violation interpreting such rules or regulations.

95. 42 U.S.C. § 7193(a) (1982). The Secretary has delegated his authority to issue remedial orders to the Office of Hearings and Appeals. Department of Energy Delegation Orders Nos. 0204–24 (Mar. 30, 1978), 1100.3 (Sept. 15, 1978), Statutory and Regulatory Appendix for Appellant 8–17.

96. 42 U.S.C. § 7193(a).

97. *Id.* § 7193(b).

98. *Id.* § 7193(c).

99. *Id.*

100. *Id.* § 7193(b).

101. *Id.* § 7193(c).

102. *Id.* § 7193(b).

103. *Id.* § 7193(c).

104. *Id.*

105. *Id.* § 7193(g). This provision became a part of § 503 in 1978. Pub.L. No. 95–620, § 805, 92 Stat. 3289 (1978). The legislative history reveals that the provision had unintentionally been de-

The determination on a defense of good-faith reliance necessarily requires a trial-type proceeding. These features of Section 503 indicate strongly that a remedial order is to be the product of an adjudicatory determination—a "particularized inquiry which will determine the legal rights and liabilities of a specific individual." [106]

The proceeding leading to the remedial order contemplated by Section 503 is in direct contrast to those agency investigations and factfinding missions that culminate in determinations having no binding legal consequence if left unpursued. An agency's decision after an investigation to bring suit, or after a finding of probable cause to issue a complaint, is merely preparatory to some further proceeding.[107] Such decisions may utilize adjudicatory-type procedures,[108] but they "determine the legal rights and liabilities of" no one; rath-er, they require subsequent affirmative action, often by a third party before an independent tribunal, before they acquire any legal efficacy.[109] An unappealed remedial order of the Department of Energy, however, requires no further action, or further proceeding before becoming fully effective and binding.

## B. The Legislative History

The legislative history of Section 503 indicates that Congress intended to endow the Secretary of Energy with the same adjudicatory power previously possessed by the Federal Energy Administration. To begin with, the use of the term "remedial order" without explanation evinces retention of that term's pre-Organization Act definition. Since 1973, a remedial order had been considered to be an adjudicated

leted from the Organization Act by the Conference Committee. See 123 Cong.Rec. 26031 (1977) (remarks of Senator Javits). Both Houses made clear in 1977 that despite this inadvertence, the good-faith-reliance defense "continues to be the policy of the Congress." 123 Cong. Rec. 26107 (1977) (remarks of Representative Findley); *id.* at 26032 (remarks of Senators Jackson and Hansen).

**106.** *Gray Panthers v. Schweiker,* 209 U.S.App. D.C. 153, 162 n. 18, 652 F.2d 146, 155 n. 18 (1980).

**107.** See, e.g., *FTC v. Standard Oil Co.,* 449 U.S. 232, 241–242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416, 425 (1980) (FTC issuance of complaint on "reason to believe" law has been violated has no "legal or practical effect," but merely initiates adjudicatory proceeding); *International Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers,* 419 U.S. 428, 443–444, 95 S.Ct. 600, 609–610, 42 L.Ed.2d 558, 570–571 (1975) (NLRB investigatory proceeding under § 10(k) of National Labor Relations Act, 29 U.S.C. § 160(k) (1982), despite formal evidentiary hearing and decision, is not an adjudication because resulting decision, "standing alone, binds no one"); *Hannah v. Larche,* 363 U.S. 420, 441, 80 S.Ct. 1502, 1541, 4 L.Ed.2d 1307, 1321 (1960) (Commission on Civil Rights does not adjudicate because it "cannot take any affirmative action which will affect an individual's legal rights"; it can only "find facts which may subsequently be used as the basis for legislative or executive action"); *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 600, 70 S.Ct. 870, 873, 94 L.Ed. 1088, 1094

(1950) (FDA determination of probable cause "in and of itself had no binding legal consequence"); *United States v. Morgan,* 222 U.S. 274, 281, 32 S.Ct. 81, 82, 56 L.Ed. 198, 200 (1911) (Department of Agriculture finding that goods are adulterated or misbranded is "not binding" against party from whom sample received; there must be subsequent prosecution); *Georator Corp. v. EEOC,* 592 F.2d 765, 768 (4th Cir. 1979) (EEOC determination of reasonable cause to believe charge of discrimination, "[s]tanding alone, ... is lifeless, and can fix no obligation nor impose any liability on the plaintiff"); *FTC v. Cinderella Career & Finishing School, Inc.,* 131 U.S.App.D.C. 331, 345 n. 45, 404 F.2d 1308, 1322 n. 45 (1968) (concurring opinion) ("effectuation" of FTC complaint must await subsequent adjudicatory hearing); *SEC v. OKC Corp.,* 474 F.Supp. 1031, 1041–1042 (N.D.Tex.1979) (SEC investigatory factfinding has no "determinate consequences").

**108.** See, e.g., *International Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers, supra* note 107, 419 U.S. at 443, 95 S.Ct. at 610, 42 L.Ed.2d at 570 (quoting Attorney General's Manual on the Administrative Procedure Act 40 (1947)).

**109.** See, e.g., *Hannah v. Larche, supra* note 107, 363 U.S. at 452, 80 S.Ct. at 1520, 4 L.Ed.2d at 1327; *Ewing v. Mytinger & Casselberry, Inc., supra* note 107, 339 U.S. at 600, 70 S.Ct. at 873, 94 L.Ed. at 1094; *United States v. Morgan, supra* note 107, 222 U.S. at 281, 32 S.Ct. at 82, 56 L.Ed. at 200; *Gerorator Corp. v. EEOC, supra* note 107, 592 F.2d at 768; *SEC v. OKC Corp., supra* note 107, 474 F.Supp. at 1041.

finding of a violation.[110] More importantly, the legislative history is conspicuously silent on any intent to reduce the Secretary's authority from the formerly held by the Administration. On the contrary, it was "in view of the broad powers which are given to the Secretary" that Section 503 was enacted.[111]

Congress recognized that the Administration's prior exertions of the powers now vested in the Secretary had raised due-process concerns.[112] The appeal to the Commission, now provided for in Section 503(c), ensures that regardless of what procedures the Secretary employs in exercising the authority to issue remedial orders, adversely-affected parties will have the opportunity to contest those orders before an independent body with full due-process protection, even prior to any subsequently-developing need to resort to a court. Thus, Senator Javits characterized Section 503(c) as entitling the target of a remedial order to "a factual hearing upon the evidence," rather than limiting him to a judicial appeal "upon the record ... which can then be decided only on the substantial-evidence rule."[113] The House sponsor of Section 503, Representative Eckhardt, similarly stated that

> [without Section 503(c),] there is no procedure by which a person ordered to comply with a rule or regulation by a remedial order can get a hearing before the agency.... [The purpose of Section 503(c) is to] give a person against whom [a] remedial order is issue[d] a right to a hearing before the agency.
>
> I think it merely affords minimal due process. It affords a little bit less oppor-

tunity for a full adjudicatory type hearing than is afforded by the Administrative Procedure Act; but it gives the right to a person to be confronted by the agency's evidence on the other side.... [I]t gives him a record on which a court may ultimately determine whether the agency decision was based substantially on the record as a whole. No such procedures are now provided.[114]

The legislative focus thus was on a perceived absence of due process under Federal Energy Administration procedures and the need to provide it under the Organization Act.[115] Just how that was to be accomplished emerges from the statutory scheme. The preexisting authority of the Administration—now entrusted to the Department of Energy—remained intact. The hearing before the Federal Energy Regulatory Commission was, in the words of Senator McClure, to be an *additional proceeding* internally ... before it got to court";[116] as the Conference stated, what was being vested in the Commission was "jurisdiction over internal agency *appeals* from remedial orders."[117] The nature and scope of the Commission's review introduces an additional consideration,[118] but surely the classification of the Commission proceeding as an "appeal" implies a prior adjudication. In formulating the Organization Act, Congress thus gave the target of a remedial order by the Secretary an optional "second bite of the apple." If the target chooses not to contest the order, it becomes a final and binding adjudication, and is not subject to further administrative or judicial review. In such cases, the Secretary acts as investigator, prosecutor and

---

**110.** See note 10 *supra.*

**111.** See 123 Cong.Rec. 15295 (1977) (remarks of Senator Javits).

**112.** See text *supra* at notes 24–27.

**113.** 123 Cong.Rec. 15295 (1977).

**114.** *Id.* at 17402–17403 (1977).

**115.** The Conference Committee stated that the "intent of Congress [was] that those involved in

enforcement actions ... be extended procedural due process. Congress always intended that notions of fair play and due process be followed in the administrative process." Conference Report, *supra* note 48, at 85–86.

**116.** 123 Cong.Rec. 15296 (1977) (emphasis added).

**117.** Conference Report, *supra* note 48, at 85 (emphasis added), U.S.Code Cong. & Admin. News 1977, at 956.

**118.** See text *infra* at notes 143–150.

adjudicator, and further opposition to the order is voluntarily waived. If, however, the order is contested, for whatever reason, the "quasi-judicial function of determining whether in fact violation has occurred" is conferred upon the Commission, with the Secretary as prosecutor.[119] Absent a challenge to the order, Congress was not concerned with the provision of procedural safeguards; if the order was challenged, a hearing before the Commission was available.

Indubitably, the Secretary has been given full procedural discretion in the issuance of remedial orders. Section 503(e) specifies that

> [n]othing in preceding provisions of this section shall be construed to affect any procedural action taken by the Secretary prior to or incident to initial issuance of a remedial order which is the subject of the hearing provided in preceding provisions of this section, but such procedures shall be reviewable in the hearing.[120]

Section 503(e), of course, is not the source of the Secretary's power to adjudicate, for it is not a substantive grant of authority; it states only that, in the exercise of his authority to issue remedial orders, the Secretary is free to fashion appropriate procedures, and that the "adequacy of such procedures" is then reviewable by the Commission.[121] Congress may not have foreseen that its criticism of the Federal Energy Administration's procedures would prompt the Secretary to institute the formal procedures challenged here, but Section 503(e) plainly leaves with the Secretary the power to do so.[122]

### C. The Administrative Construction

In our search for the true meaning of Section 503 respecting price-control adjudications by the Department of Energy, we are mindful of our duty to accord considerable deference to the Department's own interpretation of its enabling statute.[123] That deference, we have

---

**119.** 123 Cong.Rec. 14878 (1977) (remarks of Senator Javits).

**120.** 42 U.S.C. § 7193(e) (1982).

**121.** *Id.*

**122.** See *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460, 479 (1978) ("absent constitutional constraints or extremely compelling circumstances," agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties"). See also *FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383, 391 (1965); *FTC v. Anderson,* 203 U.S.App.D.C. 159, 164, 631 F.2d 741, 746 (1979); *FTC v. Brigadier Indus. Corp.,* 198 U.S.App.D.C. 377, 382, 613 F.2d 1110, 1115 (1979). We agree with Professor Byse, who shortly after the Organization Act was passed, described the Secretary's issuance of a remedial order as an adjudication and noted:

> Perhaps less attention was devoted to adjudications to be considered by the Secretary because they would usually be informal, since nearly all "on the record" adjudications are to be conducted by the Commission. But informal determinations can be important to energy producers and consumers alike. The procedures developed under the "assimilated statutes" should be followed because this is the general thrust of the entire DOE Act....

> Non-observance of pre-existing procedures with respect to informal adjudication would be inconsistent with this general thrust. Such legislative intent should not be imputed. Accordingly, although nothing in the DOE Act specifies the procedures for informal adjudications, I believe that past practice should prevail.... However, I do not mean to suggest by this that DOE's informal adjudicative procedures are frozen forever into the mold of the transferring agency as of the effective date of the DOE act.... [T]o the extent that section 644 so empowers him, the Secretary may change procedural requirements.... [T]hat section would provide the necessary authority for the Secretary to change procedures which the transferring agency had provided in the exercise of its discretion.

Byse, *The Department of Energy Organization Act: Structure and Procedure,* 30 Ad.L.Rev. 193, 212–213 (1978) (emphasis added) (footnote omitted). Section 644 of the Act, 42 U.S.C. § 7254 (1982), gives the Secretary general rulemaking authority in the administration of all of his "functions," including issuance of remedial orders. Section 503(e) pertains exclusively to remedial orders, affirming the Secretary's procedural discretion and ensuring an opportunity for Commission review of the exercise of that discretion.

**123.** E.g., *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728, 736 (1982); *Quern v. Mandley,* 436 U.S. 725, 738, 98 S.Ct.

said, "is heightened when, as here, the interpretation is of a new statute by its implementing agency." [124] To concur with the agency's interpretation, "we need not find that its construction is the only reasonable one, or even that it is the result we would have reached ... in the first instance...." [125] Rather, we must abide the "principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." [126]

The Department's construction of Section 503 is consistent with the interpretation judicially placed upon the closely analogous enforcement provision of the Occupational Safety and Health Act of 1970,[127] a provision also drafted by Senator Javits. Under that legislation, the Secretary of Labor is empowered, "upon inspection or investigation," to issue a "citation" whenever he "believes that an employer has violated" the Act.[128] Like remedial orders under the Organization Act, the citation must "describe with particularity the nature of the violation" and include a reference to the provision "alleged to have been violated." [129] If not contested within 15 days, the citation is deemed final and "not subject to review by any court or agency." [130] If the party cited contests the citation, a hearing is held before the independent Occupation Safety and Health Review Commission, which—like the Federal Energy Regulatory Commission under the Organization Act—has an explicit mandate to "issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation or proposed penalty." [131]

A citation issued by the Secretary of Labor becomes a final order "if the employer accepts it or does not 'contest' it." [132]

2068, 2076, 56 L.Ed.2d 658, 670 (1978); *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165 (1971); *United States v. City of Chicago,* 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12–13 (1970).

124. *Alabama Power Co. v. Costle,* 204 U.S.App. D.C. 51, 117 n. 128, 636 F.2d 323, 389 n. 128 (1979) (opinion of Robinson, J.), quoting *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 403 n. 64, 541 F.2d 1, 31 n. 64 (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), in turn citing *Power Reactor Devel. Co. v. International Union of Elec. Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961); *United States v. Zucca,* 351 U.S. 91, 96, 76 S.Ct. 671, 674, 100 L.Ed. 964, 970 (1956); *United States v. American Trucking Ass'ns,* 310 U.S. 534, 539, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345, 1354 (1940); *Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933); *Natural Resources Defense Council v. Train,* 166 U.S.App.D.C. 312, 326, 510 F.2d 692, 706 (1975).

125. *National Treasury Employees Union v. Federal Labor Relations Auth.,* 223 U.S.App.D.C. 364, 369–370, 691 F.2d 553, 558–559 (1982), quoting *Department of Defense v. Federal Labor Relations Auth.,* 212 U.S.App.D.C. 256, 277, 659 F.2d 1140, 1161 (1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), in turn quoting *Unemployment Compensation Comm. v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145 (1946).

126. *Miller v. Youakim,* 440 U.S. 125, 145 n. 25, 99 S.Ct. 957, 969 n. 25, 59 L.Ed.2d 194, 209 n. 25

(1979), quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–1802, 23 L.Ed.2d 371, 383–384 (1969). Accord, *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 121, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772, 794 (1973); *E.I. du Pont de Nemours and Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100, 108 (1977).

127. Pub.L. No. 91–596, 84 Stat. 1590 (1970) (codified at 29 U.S.C. §§ 651 *et seq.* (1982)) [hereinafter cited as codified].

128. 29 U.S.C. § 658(a) (1982).

129. *Id.*

130. *Id.* § 659(a).

131. *Id.* § 659(c).

132. *Brennan v. Occupational Safety & Health Review Comm'n,* 487 F.2d 438, 441 (8th Cir. 1973), quoting 29 U.S.C. § 659(a) (1982). See also *Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Comm'n,* 519 F.2d 1200, 1205 (3d Cir.1975), *aff'd on other grounds,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n,* 518 F.2d 990, 1012 (5th Cir. 1975), *aff'd on other grounds,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Dan J. Sheehan Co. v. Occupational Safety & Health Review Comm'n,* 520 F.2d 1036, 1041 (5th Cir.1975), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976).

Like a remedial order, a citation is "self-executing" if not contested.[133] If contested, the citation and its proposed penalty "merely become[ ] advisory," for the statute has been interpreted to require the Occupational Safety and Health Review Commission to act de novo.[134] The Fifth Circuit has likened the statutory scheme to a "two-tier trial court system," akin to those statutory systems providing for a "trial de novo following appeal from conviction by an inferior court."[135] Although the Secretary of Labor has successfully resisted attempts to require him to provide, prior to issuance of a citation, a hearing or other due process protection characteristic of formal adjudicative proceedings,[136] he has not been prohibited from doing so.

## D. *Other Considerations*

■■ ARCO argues that the case at bar is governed by Section 402(d) of the Organization Act, which gives the Commission exclusive jurisdiction to "hear and determine" matters "(1) involving any agency determination required by law to be made on the record after an opportunity for an agency hearing; or (2) involving any other agency determination which the Secretary determines shall be made on the record after an opportunity for an agency hearing."[137] ARCO claims that the Secretary's description of remedial orders as "adjudications that require the determination of fac-

tual or legal issues based on a substantial record"[138] is the same as a determination that the proceeding shall be "made on the record after an opportunity for an agency hearing" within the meaning of the statute, and thus that remedial orders may be adjudicated only by the Commission. We think it clear that the Secretary's characterization of remedial-order adjudications as requiring "the determination of factual or legal issues based on a substantial record" does not connote a hearing requirement such as to invoke Section 402(d).[139]

ARCO also argues that the procedures of the Department and the Commission deprive ARCO of any sort of fair hearing and subvert the statutory scheme. Just what Congress intended the nature and scope of the hearing before the Commission to be is not clear. Congress may not have anticipated the Secretary's procedural expansion of the Department's proceedings, and the consequent transfer to the Commission of a highly-developed evidentiary record. It is evident that despite the Conference Committee's characterization of the proceeding before the Commission as an "appeal,"[140] the statutory requirement that an opportunity for an evidentiary hearing be provided goes beyond the normal procedural range of appellate review. Current Commission regulations provide for a hybrid proceeding—neither de novo nor fully appellate.[141]

**133.** *Marshall v. Sun Petroleum Prods. Co.,* 622 F.2d 1176, 1184 (3d Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); *Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Comm'n, supra* note 132, 519 F.2d at 1205.

**134.** *Brennan v. Occupational Safety & Health Review Comm'n supra* note 132, 487 F.2d at 442. See also *Long Mfg. Co. v. Occupational Safety & Health Review Comm'n,* 554 F.2d 903, 908 (8th Cir.1977); *Dan J. Sheehan Co. v. Occupational Safety & Health Review Comm'n, supra* note 132, 520 F.2d at 1041.

**135.** *Dan J. Sheehan Co. v. Occupational Safety & Health Review Comm'n, supra* note 132, 520 F.2d at 1041–1042.

**136.** See *id.* at 1042; *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, supra* note 132, 518 F.2d at 1012; *Frank Irey, Jr., Inc.*

*v. Occupational Safety & Health Review Comm'n, supra* note 132, 519 F.2d at 1205.

**137.** 42 U.S.C. § 7172(d) (1982).

**138.** DOE Delegation Order No. 1100.3 ¶¶ 3(a)(3), (a)(6), 3(1)(8), 5(b) (Sept. 15, 1978); DOE Delegation Order No. 0204–24, ¶¶ 8, 9 (Mar. 30, 1978).

**139.** 42 U.S.C. § 7172(d) (1982).

**140.** See note 117 *supra.*

**141.** 18 C.F.R. subpt. I (1984). See also 43 Fed. Reg. 52219, 52223 (Nov. 9, 1978) ("the Commission believes, based upon an examination of the statute and the legislative history, that section 503 of the Act does not require the Commission to conduct a de novo proceeding in every case of remedial order review").

Although the record before the Department is certified to the Commission, it has the discretion to permit the introduction of new issues, including those "the petitioner was not permitted to raise in the prior proceedings due to erroneous adverse procedural rulings" [142] and new evidence derived from additional discovery.[143] "In all cases," the Commission advises, it "will conduct an independent scrutiny of all parts of the record, including the uncontested portions, in order to arrive at a decision.[144]

The Commission is not a party to this litigation, however, and its regulations are not before us. We decide today only the question of the Secretary's power to adjudicate remedial-order issues—a matter not dependent upon the Commission's procedures. Indeed, the scope and validity of those procedures are matters not yet ripe for judicial review; ARCO remains free to challenge them at the proper juncture.

■■ ARCO further contends that the Department's remedial-order adjudications violate due process in that (1) they impermissibly combine prosecutorial and judicial functions; (2) the Department does not utilize independent administrative law judges; and (3) the proceedings are "fundamentally unfair" in the allocation of the burden of proof and the failure to provide for a hearing as of right. The Department of Energy is not, however, statutorily obligated to provide administrative law judges, a hearing or any particular procedural safeguards. It is the Commission that must provide a hearing and other due-process protections,[145] and that may require utiliza-

tion of administrative law judges.[146] Moreover, any due-process objections ARCO registers to the Department's procedures, as opposed to questions about the scope of the Department's power, are subject to initial review before the Commission,[147] and cannot be considered here.[148]

## VI. POWER TO IMPOSE SANCTIONS

Finally, ARCO insists that even if the Department of Energy has remedial-order adjudicatory authority, it does not extend to preclusion of affirmative defenses as a sanction for disobedience of a departmental discovery order. Rather, ARCO contends, judicial enforcement of subpoenas is the sole means by which the Department can obtain compliance with such orders. Alternatively, ARCO says that, at the least, power to impose discovery sanctions administratively must be expressly conferred by Congress, and cannot be implied from a general grant of authority to prescribe procedural rules and regulations. We are unable to subscribe to these positions.

In support of its claim that the Department is helpless to police discovery save by resort to the courts, ARCO relies heavily on a recent Ninth Circuit decision, *NLRB v. International Medication Systems, Ltd.*[149] In that case, the National Labor Relations Board subpoenaed an employer's personnel records, seeking information on the employer's policy on absenteeism and layoffs. The employer refused to produce the records and the Board did not seek judicial enforcement of the subpoena. Instead, the employer was barred from rebutting the general counsel's evidence on those sub-

---

**142.** 18 C.F.R. § 385.907(a)(iii) (1984).

**143.** *Id.* § 385.908.

**144.** 43 Fed.Reg. 52219, 52221 (Nov. 9, 1978).

**145.** See 42 U.S.C. § 7193(c) (1982).

**146.** See *id.* § 7171(g); see also 5 U.S.C. § 556 (1982). We do not decide just when administrative law judges must preside over remedial-order appeals.

**147.** *Id.* 42 U.S.C. § 7193(c) (1982).

**148.** Administrative remedies must be exhausted even though the claim is constitutional in nature. *Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. 752, 772, 67 S.Ct. 1493, 1503, 91 L.Ed. 1796, 1808 (1947); *Wallace v. Lynn*, 165 U.S.App.D.C. 363, 367–368, 507 F.2d 1186, 1190–1191 (1974); *Freeman v. Shultz*; 152 U.S.App.D.C. 16, 20, 468 F.2d 120, 124 (1972); *Hadnott v. Laird*, 149 U.S.App.D.C. 358, 365, 463 F.2d 304, 311 (1972).

**149.** 640 F.2d 1110 (9th Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 134 (1982).

jects either by cross-examining witnesses or by presenting its own evidence.[150] The Ninth Circuit reversed, holding that the Board could not "by-pass district court enforcement proceedings," and that "challenges to agency subpoenas must be resolved by the judiciary before compliance can be compelled."[151] The court treated the Board's preclusion order as an action intruding upon the judicial contempt power,[152] and implied that, even absent an outstanding subpoena, administrative discovery sanctions could not be utilized "before the judicial questions have been asked and answered."[153]

We are unable to accept ARCO's thesis that the Department cannot impose evidentiary sanctions—of course, short of a fine or imprisonment—when necessary to preserve the integrity of an authorized adjudicative proceeding. *International Medication Systems* was premised on *Interstate Commerce Commission v. Brimson*,[154] in which the Supreme Court stated:

> The inquiry whether a witness before the Commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination. Such a body could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judg-

ment of fine or imprisonment.... [T]he power to impose fine or imprisonment in order to compel the performance of a legal duty imposed by the United States, can only be exerted, under the law of the land, by a competent judicial tribunal having jurisdiction in the premises.[155]

*Brimson* is the basis of the well-established principle that agencies do not have power to enforce their own subpoenas, as they do not have "authority to compel obedience to [their] orders by a judgment of fine or imprisonment."[156] At issue in *Brimson* was a subpoena issued by the Commission during the course of an investigation in which the Commission was acting as a "nonjudicial body."[157] *Brimson*, however, is wholly silent as to the power an agency acting in an authorized judicial or quasi-judicial capacity to impose sanctions *short of a fine or imprisonment* in order to compel compliance with discovery orders issued during the course of an adjudicatory proceeding.

■ *Brimson* was decided in 1894, long before the advent of the "modern administrative state."[158] Although *Brimson* acknowledged that "there are matters involving public rights" which are "susceptible of judicial determination," yet within the power of Congress to remove from the "cognizance of the courts of the United States,"[159] it was not until 1932 that, in *Crowell v. Benson*,[160] the scope of the power became clear. *Crowell* held that admin-

---

150. *Id.* at 1112.

151. *Id.* at 1115–1116.

152. *Id.* at 1115 n. 5, 1116 n. 6.

153. *Id.* at 1116 (footnote omitted).

154. 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894).

155. *Id.* at 485, 14 S.Ct. at 1136, 38 L.Ed. at 1060.

156. *Id.; United States v. Hill, supra* note 39, 224 U.S.App.D.C. at 143, 694 F.2d at 263 (emphasizing "sharp distinction between the agency power to issue subpoenas and judicial power to *enforce* them") (emphasis in original); *United States v. Exxon Corp.,* 202 U.S.App.D.C. 70, 77,

628 F.2d 70, 77, *cert. denied,* 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980); *United States v. Fitch Oil Co.,* 676 F.2d 673, 679 (Temp.Emer. Ct.App.1982).

157. 154 U.S. at 469, 14 S.Ct. at 1130, 38 L.Ed. at 1054.

158. Freedman, *Crisis and Legitimacy: The Administrative Process and American Government* 3 (1978).

159. 154 U.S. at 475, 14 S.Ct. at 1132, 38 L.Ed. at 1056, quoting *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372, 377 (1856).

160. 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

istrative agencies may adjudicate claims arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." [161] Because Congress is "free to commit such matters completely to nonjudicial executive determination," it may employ "the less drastic expedient of committing their determination to ... an administrative agency." [162] We think the broad congressional power to authorize agencies to adjudicate "public rights" necessarily carries with it power to authorize an agency to take such procedural actions as may be necessary to maintain the integrity of the agency's adjudicatory proceedings.[163] We think, too, that such a grant of authority encompasses the preclusion order at issue here.[164]

We have sustained, indeed required, the drawing of adverse inferences against persons not complying with discovery orders in adjudicatory proceedings before the National Labor Relations Board.[165] The adverse-inference rule, we said, is a "well recognized means available for vindicating [an agency's] power to require production of relevant documents short of a subpoena enforcement proceeding." [166] Collateral enforcement proceedings, we recognized, are "cumbersome and time-consuming," [167] and "[t]he adverse inference rule provides a quick, fair method of encouraging parties to come forward with all material relevant to the controversy between them." [168] We noted also that the applicability of the rule "in no way depends on the existence of a subpoena compelling production of the evidence in question." [169]

The preclusion rule at issue in the *Property Case* differs from the adverse-inference rule in that it prevents the party frustrating discovery from introducing evidence in support of his position on the factual issue respecting which discovery was sought.[170] Until the decision in *International Medication Systems,* other circuits considering the question had likewise sustained that sort of evidentiary ban in National Labor Relations Board adjudicatory proceedings as a sanction for noncompliance with a Board subpoena.[171] The sanction had been deemed necessary in order to "maintain[ ] the integrity of the hearing

**161.** 285 U.S. at 50, 52 S.Ct. at 292, 76 L.Ed. at 612. See also *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 68, 102 S.Ct. 2858, 2869, 73 L.Ed.2d 598, 613 (1982) (plurality opinion).

**162.** *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra* note 161, 458 U.S. at 68, 102 S.Ct. at 2870, 73 L.Ed.2d at 613. See also *Crowell v. Benson, supra* note 160, 285 U.S. at 50, 52 S.Ct. at 292, 76 L.Ed. at 612.

**163.** See *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra* note 161, 458 U.S. at 83, 102 S.Ct. at 2878, 73 L.Ed.2d at 623 ("when Congress creates a statutory right, it clearly has the discretion, in defining that right to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created") (footnote omitted).

**164.** Because ARCO's claims pertaining to the *Affiliate Transfer Case* are not within our jurisdiction, see text *supra* at notes 38–55, the threat of adverse inferences from ARCO's refusal to permit discovery in that case, see text *supra* at note 35, is not before us here.

**165.** *UAW v. NLRB,* 148 U.S.App.D.C. 305, 459 F.2d 1329 (1972).

**166.** *Id.* at 319, 459 F.2d at 1343.

**167.** *Id.*

**168.** *Id.* at 320, 459 F.2d at 1344.

**169.** *Id.* at 314, 459 F.2d at 1338.

**170.** *Id.* at 321, 459 F.2d at 1345.

**171.** *NLRB v. C.H. Sprague & Son Co.,* 428 F.2d 938, 942 (1st Cir.1970) (employer who refused to produce concededly relevant information in response to subpoena precluded from "cross examin[ing] witnesses with reference to any matter which could have been produced by complying with the subpoena"); *NLRB v. American Art Indus.,* 415 F.2d 1223, 1230 (5th Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970) (employer not allowed "to later produce evidence of a secondary nature to prove what could have been conclusively established if the subpoena had been honored").

process," [172] and we consider that need no less compelling in situations such as that now before us.

An evidentiary preclusion order falls far short of an effort to exact compliance with a subpoena by a judgment of fine or imprisonment.[173] Furthermore, over the years since *Crowell v. Benson*, we have increasingly entrusted agencies with decisionmaking affecting many rights and privileges hardly less important than those at stake in discovery rulings. It seems to us incongruous to grant an agency authority to adjudicate—which involves vitally the power to find the material facts—and yet deny authority to assure the soundness of the factfinding process. Without an adequate evidentiary sanction, a party served with a discovery order in the course of an administrative adjudicatory proceeding has no incentive to comply, and ofttimes has every incentive to refuse to comply.[174]

 Lest it be forgotten, judicial review of the discovery sanction in the *Property Case* remains available.[175] Should the Federal Energy Regulatory Commission sustain the Department's preclusion order, ARCO is free to challenge the sanction in a federal district court on review of any adverse Commission final order. The court will then determine independently whether, under the particular circumstances, the sanction was justified.[176]

 In our view, evidentiary sanctions for recalcitrance in discovery are part and parcel of the power conferred upon the Secretary of Energy to adjudicate the factual issues related to remedial orders. It follows that such sanctions need not be authorized *eo nomine* in the Secretary's enabling statute. Moreover, the Secretary was given power "to prescribe such procedural and administrative rules and regulations as he may deem necessary or appropriate to administer and manage the functions now or hereafter vested in him." [177] In light of the "overwhelming judicial support given to expansive agency readings of statutory rule-making authorization that are not flatly inconsistent with other statutory provisions," [178] the Department of En-

**172.** *NLRB v. C.H. Sprague & Son Co., supra* note 171, 428 F.2d at 942; *American Art Indus. v. Consumer Prod. Safety Comm'n, supra* note 171, 415 F.2d at 1230.

**173.** But see Note, *The Argument for Agency Self-Enforcement of Discovery Orders*, 83 Colum.L. Rev. 215, 228–229 n. 62 (1983); Williams, *Authority of Federal Agencies to Impose Discovery Sanctions: The FTC—A Case in Point*, 65 Geo. L.J. 739, 757–758 (1977).

**174.** *UAW v. NLRB, supra* note 168. See also Note, *supra* note 173, 83 Colum.L.Rev. at 217–219. The courts have taken a liberal attitude toward administrative discovery procedures, see, e.g., *Smith v. Schlesinger*, 168 U.S.App.D.C. 204, 217–218 & n. 46, 513 F.2d 462, 475–476 & n. 46 (1975) and cases cited therein; see also *Uniroyal, Inc. v. Marshall*, 482 F.Supp. 364 (D.D.C. 1979), and such procedures are now commonplace. ARCO, of course, does not suggest that discovery in its own behalf should not be permitted in the *Property Case*, nor presumably would it object to an evidentiary sanction designed to induce discovery in its favor. Discovery in administrative proceedings "encompasses both an interest in proper preparation of a defense and an interest in fair treatment of an accused party." *Smith v. Schlesinger, supra*, 168 U.S.App.D.C. at 217, 513 F.2d at 475, and evidentiary sanctions for ARCO's benefit could protect those interests.

**175.** See *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra* note 161, 458 U.S. at 69–70 n. 23, 102 S.Ct. at 2870–2871 n. 23, 73 L.Ed.2d at 614 n. 23; *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 455 n. 13, 97 S.Ct. 1261, 1269 n. 13, 51 L.Ed.2d 464, 475 n. 13 (1977).

**176.** We repeat that judicial review at this juncture is limited to the question of whether the Department has power to impose an evidentiary sanction, and does not extend to the question of propriety of any sanction actually imposed.

**177.** 42 U.S.C. § 7254 (1982).

**178.** *National Petroleum Refiners Ass'n v. FTC*, 157 U.S.App.D.C. 83, 102, 482 F.2d 672, 691 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974) and cases cited therein; *Uniroyal, Inc. v. Marshall*, 579 F.2d 1060, 1066–1067 (7th Cir.1978). The cases cited by ARCO are not to the contrary. Although in *FMC v. Anglo-Canadian Shipping Co.*, 335 F.2d 255 (9th Cir.1964), it was held that an agency cannot "predicate a discovery rule" on a general rule-making provision, *id.* at 259; see also *Fairbank v. Hardin*, 429 F.2d 264 (9th Cir.), *cert. denied*, 400 U.S. 943, 91 S.Ct. 244, 27 L.Ed.2d 247

ergy was at liberty to infer therefrom supplemental authority to resort to the preclusion sanction imposed in the *Property Case.*[179]

## VII. CONCLUSION

■ Prior to 1977, when the Organization Act became law, the petroleum industry's complaint was that it was not being afforded enough protection in the process by which remedial orders issued for price-control violations. ARCO's protest in this litigation is essentially that in an important respect—two-tiered adjudication—the industry has now been given too much. We find that we have jurisdiction over ARCO's claims in the *Property Case*, and that those claims are not barred by principles of exhaustion or ripeness. We hold, however, that the Department of Energy has plenary adjudicatory power respecting remedial orders, and that such power embraces imposition of evidence-preclusion sanctions in order to maintain the integrity of the process. The sanctioning order in the *Property Case* is accordingly

*Affirmed.*[180]

(1970), that decision has recently been limited to its facts. In *Takazato v. FMC*, 633 F.2d 1276 (9th Cir.1980), *Anglo-Canadian* was characterized as a prohibition only on inter-*private-party* discovery without specific statutory authorization. More importantly, *Anglo-Canadian* has been considerably undermined in recent years. See *Smith v. Schlesinger, supra* note 174, 168 U.S.App.D.C. at 217–218 n. 46, 513 F.2d at 475–476 n. 46; *National Petroleum Refiners Ass'n v. FTC, supra*, 157 U.S.App.D.C. at 102, 480 F.2d at 691; *Uniroyal v. Marshall, supra* note 174, 482 F.Supp. at 367.

179. See note 176 *supra.*

180. It is well settled that a decision correct in result will not be reversed on appeal simply because the district court relied upon a legally unacceptable rationale. *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943); *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224, 230 (1937).