**BAKER HUGHES INCORPORATED,**
Plaintiffs,

v.

**Michael K. KIRK, Acting Commissioner
of Patents and Trademarks,
Defendant.**

Civil Action No. 93–1571.

United States District Court,
District of Columbia.

Nov. 8, 1995.

Charles D. Tetrault, Alden L. Atkins, Vinson & Elkins, Washington, D.C., A.H. Evans, Peter E. Mims, Vinson & Elkins, Houston, TX (Carl A. Rowold, Baker Hughes Incorporated, Houston, Texas, of counsel), for Plaintiffs.

Teddy S. Gron, Associate Solicitor, Arlington, VA, for Defendant.

HAROLD H. GREENE, District Judge.

## MEMORANDUM

Plaintiff, Baker Hughes Incorporated, initiated this action against Michael K. Kirk, Acting Commissioner of Patents and Trademarks. Plaintiff alleges that defendant's decision to examine a reissue application for United States Patent No. 4,928,999 (the " '999 Patent") filed by Hydril Company ("Hydril") and to hold proceedings under the reissue application to determine inventorship, without the consent of Baker Hughes, an assignee of record of the patent, exceed the Patent and Trademark Office's ("PTO") statutory authority and should be enjoined. Specifically, plaintiff argues that: defendant's actions exceed his statutory authority and are contrary to law; defendant has abused his discretion and has acted arbitrarily and capriciously and not in accordance with law; and defendant has violated Baker Hughes' due process rights under the Fifth Amendment of the United States Constitution by purporting to decide Baker Hughes' property rights in the '999 Patent in an *ex parte* proceeding.

## I

### Background

On April 30, 1984, Hydril deposited a patent application for elastomeric guard seal for tubular connections in the PTO. There were three joint inventors named in the application. A declaration of inventorship was signed on April 24, 1984 by first named joint inventor L. Steven Landriault, by second named joint inventor Donald J. Ortloff, and by Landriault for third named joint inventor Charles A. Bollfrass. All three inventors had been working for Hydril at the time that they developed the subject matter of the patent application.

Bollfrass refused to sign the declaration of inventorship that was required to be attached to the application. Hydril and the other two inventors sought, pursuant to 37 C.F.R. § 1.47(a), to have the patent application allowed to proceed without Bollfrass joining in the application. Towards this end, Landriault and two Hydril attorneys filed declarations that Bollfrass was a joint inventor of the subject matter of the patent during his employment at Hydril, and that Bollfrass refused to sign the declaration of inventorship. Landriault declared that he had signed Bollfrass' name to the attached declaration pursuant to 37 C.F.R. 1.47(a).

The PTO allowed the patent application to proceed without Bollfrass' signature. The PTO informed Bollfrass that he was named as joint inventor in the application, that the application had been filed under 37 C.F.R. 1.47(a) and had been granted a filing date of April 30, 1984, and that Bollfrass had the same rights under Rule 47(a) as if he had joined in the inventor's declaration.

On April 30, 1984, the PTO recorded Landriault's and Ortloff's assignments of their interest in the patent to Hydril. On May 29, 1990 the PTO issued the '999 Patent, which listed Landriault, Ortloff, and Bollfrass as joint inventors, and Hydril as assignee. On June 18, 1992, Bollfrass assigned his interest in the '999 Patent to Baker Hughes, and the PTO recorded the assignment.

During the course of these events, there were two related judicial proceedings. In 1985, Hydril sued Bollfrass and others in Texas state court, alleging that Bollfrass had breached his employment agreement with Hydril. Part of the relief sought by Hydril was that the court order Bollfrass to assign his interest in the Resilient Seal Invention, and any patent applications based on or resulting from that invention to Hydril. *Hydril Company v. Charles A. Bollfrass et al*, No. 85-45-013, 295th Judicial District, District Court of Harris County, Texas. After a jury trial, a final judgment was entered on January 6, 1992 in favor of Bollfrass.

In 1990, after the '999 Patent had been issued, Hydril sued Baker Hughes and certain of its distributors alleging infringement in an action entitled *Hydril Co. v. Baker Hughes, Inc., et al.*, Civil Action No. H–90–1994 (S.D.Texas) (the "Infringement Action"). Since September 1992, Baker Hughes' summary judgment motion and Hydril's opposition thereto have been pending.

On August 26, 1992, Hydril filed an application with the PTO pursuant to 35 U.S.C. § 251 seeking reissue of the '999 Patent to delete Bollfrass as a named inventor.[1] Baker Hughes did not join the application and has not consented to the reissue proceeding.

On September 17, 1992, the PTO mailed a "notice to file missing parts of application" to Hydril because the application did not satisfy the requirements of 35 U.S.C. § 251 for reissue because the application had not been made and sworn to by the apparent assignee of the entire interest in the original patent. According to PTO records both Hydril and Baker Hughes were assignees of interests in the patent. Hydril petitioned the Commissioner to remove the "notice to file missing parts," and to consider the reissue oath in its August 26, 1992 application a sufficient basis on which to proceed with the reissue application. Hydril contended that Bollfrass was not an inventor, and therefore Baker Hughes could have no interest in the patent and is not an assignee.

The Commissioner referred Hydril's petition to the Assistant Commissioner for Patents (the "Assistant Commissioner") for decision. On January 25, 1993, the Assistant Commissioner granted Hydril's petition and vacated the "notice to file missing parts," stating that Hydril, through its submissions, had prima facie shown that Bollfrass was not an inventor, and thus that Baker Hughes has no interest in the '999 Patent. The Assistant Commissioner wrote that his ruling was not a final decision by the PTO that Bollfrass and Baker Hughes have no interest in the '999 Patent, and that the inventorship issue would be decided by the Primary Examiner during examination of the reissue application.

On March 22, 1993, Baker Hughes petitioned the Commissioner to vacate the January 25, 1993 ruling and reinstate the "notice to file missing parts," arguing that (1) 35 U.S.C. § 251 prohibits the Commissioner from considering a reissue application filed by assignees of less than the entire interest in the patent, (2) the issue of an assignee's standing to apply for reissue is not a proper

---

1. 35 U.S.C. § 251 provides in relevant part:

    Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

    . . . .

    The provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent, except that application for reissue may be made and sworn to by the assignee of the entire interest if the application does not seek to enlarge the scope of the claims of the original patent.

    . . . .

    35 U.S.C. § 251 (1988).

subject of a petition filed under the 37 C.F.R. § 1.182 provision dealing with questions not specifically provided for in the regulations; (3) Hydril's claim that Bollfrass had no assignable interest in the '999 Patent merged into the final judgment in the Texas Action and therefore is barred by the doctrines of res judicata and claim preclusion; (4) the Commissioner's decision to resolve Baker Hughes' ownership interest in the '999 Patent in an *ex parte* proceeding violated Baker Hughes' due process rights; and (5) the Commissioner's decision that Hydril had made a prima facie showing that Bollfrass was not an inventor was based on an incomplete and misleading record, and was wrong as a matter of fact and law.[2] The Baker Hughes petition was referred to the Assistant Commissioner for decision. On March 22, 1993, Baker Hughes supplemented its petition to the Commissioner arguing that the "Commissioner simply has no authority or power to reissue a patent based on an application by an assignee of less than the entire interest." These petitions were referred to the Assistant Commissioner.

On July 15, 1993, the Assistant Commissioner denied Baker Hughes petition, and set out a bifurcated procedure which the PTO would follow. First, the primary examiner would resolve the issue of inventorship. Hydril and Baker Hughes would each have two months to file any supplemental evidence or arguments in support of their positions, and then one month to respond to the other's arguments. Under the Assistant Commissioner's July 15, 1993 decision it appears that Baker Hughes would be treated as a protestor pursuant to 37 C.F.R. § 1.291.[3] The examiner would determine the inventorship issue based on the record. If the examiner were to determine that Bollfrass is an inventor, the reissue application would not proceed without Baker Hughes' consent. Otherwise, examination of Hydril's reissue application would continue.

On July 30, 1993, Baker Hughes instituted this suit against Michael K. Kirk, Acting Commissioner of Patents and Trademarks.

## II

Plaintiff has moved for summary judgment, and defendant has moved this court to dismiss the complaint or for summary judgment.

Defendant asserts that Baker Hughes' claims are not ripe for review because the PTO's actions do not constitute a "final" action and Baker Hughes has not exhausted its administrative remedies. This court finds that the agency's assertion of jurisdiction over this matter is a final agency action, further exhaustion of administrative remedies is not required, and the issues presented are ripe for review.[4]

35 U.S.C. § 256 (1988).

**2.** In its briefs, Baker Hughes contends that 35 U.S.C. § 256 is the only provision in the patent law which deals with misjoinder or nonjoinder of inventors. 35 U.S.C. § 256 provides:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the commissioner shall issue a certificate accordingly.

**3.** Under this provision protestors have limited rights. For example, once a protestor submits his protest, he will receive no communications from the PTO other than the self-addressed postcard which he may include with his protest to serve as acknowledgment of receipt. In addition, the limited involvement of a protestor "ends with the filing of the protest, and no further submission on behalf of the protestor will be considered unless such submission raises new issues which could not have been earlier presented." 37 C.F.R. § 1.291 (1994).

**4.** While finality, exhaustion, and ripeness involve three analytically distinct inquiries, the finality issue will be discussed in conjunction with the ripeness inquiry, as it is not only a jurisdictional requirement under § 704 of the Administrative Procedure Act, but also a factor in the ripeness analysis.

## A. Exhaustion

The purpose of exhaustion is to avoid premature interruption of the administrative process, and thus to allow the agency to apply its expertise, correct its errors, and build a factual record which will aid court review. *Atlantic Richfield Co. v. United States Dept. of Energy,* 769 F.2d 771, 781 (D.C.Cir.1984). Exhaustion is not an inflexible doctrine. Exhaustion is not required when it is highly unlikely that the agency will change its position. *Id.* at 782.

The issue in this case of whether the PTO has statutory authority to consider the reissue application, and determine inventorship pursuant to the application, is a legal issue. The court's review will not be aided by further development of the factual record. In addition, this is not an issue on which agency expertise is required. "Questions of statutory interpretation are the day-to-day business of the courts." *Id.* at 783. By allowing review, the Court is not impermissibly invading the realm of the PTO. Finally, the PTO has taken a definitive position on the issue, both in its dealings with Baker Hughes and in its briefs to the Court. In this case, resort to the PTO would be futile. The PTO does not contemplate any further proceedings in which it will consider its jurisdiction over this matter. Exhaustion would not serve to further the interests underlying the doctrine. Thus, further exhaustion will not be required.

## B. Ripeness

The basic rationale of the ripeness doctrine is two-fold: to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

Determination of whether an issue is ripe consists of a two-party inquiry. First, whether the issues are "appropriate for judicial resolution," and second, whether the hardship faced by a party if denied relief at this time outweighs the institutional interests in delaying review. *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967); *Ciba–Geigy Corp. v. United States Envtl. Protection Agency,* 801 F.2d 430, 434 (D.C.Cir.1986). While courts are reluctant to apply injunctive and declaratory judgment remedies to administrative determinations unless the controversy is ripe for judicial review, *Abbott Laboratories v. Gardner,* 387 U.S. at 148, 87 S.Ct. at 1515, ripeness is not a formalistic inquiry but rather a pragmatic balancing of relevant interests. *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 125 (D.C.Cir.1974). That this is a pragmatic balancing is evinced by rulings of our Court of Appeals that where there are no significant agency or judicial interests militating in favor of delay, a lack of hardship cannot tip the balance against judicial review. *Consolidated Rail Corp. v. United States,* 896 F.2d 574, 577 (D.C.Cir.1990); *Payne Enterprises, Inc. v. United States,* 837 F.2d 486, 493 (D.C.Cir. 1988); *Eagle–Picher Indus. v. United States Envtl. Protection Agency,* 759 F.2d 905, 918 (D.C.Cir.1985).

In determining whether an issue is "fit for review," a court must look at many factors, including "whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Ciba–Geigy Corp. v. United States Envtl. Protection Agency,* 801 F.2d at 435; *see also Better Gov't Ass'n v. Department of State,* 780 F.2d 86, 92 (D.C.Cir.1986) (same); *Atlantic Richfield Co. v. U.S. Dept. of Energy,* 769 F.2d 771, 783 (D.C.Cir.1984) (same).

Baker Hughes contends, and the Commissioner's briefs concede, that the issue in this case, whether under 35 U.S.C. § 251 the PTO may consider and rule on Hydril's application for reissue of the '999 Patent without Baker Hughes' consent, is essentially legal.

In addition, the Court is hard pressed to see any benefit to be gained from postponing

review. This is not a case where further factual development will help to clarify the issue. The issue of the PTO's authority can be resolved largely by looking at the relevant statutes, legislative history, and judicial interpretations. The one benefit that might be gained from postponing review, that the outcome of the agency proceedings might be in Baker Hughes favor and thus render the issue moot, is slight when the issues are fit for review.

The third factor, whether the agency's action is sufficiently final, requires consideration of "whether the process of administrative decision-making has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). The Court must consider whether the agency's position is "definitive and whether it has a direct and immediate effect on the day-to-day business of the parties challenging the action," *Ciba–Geigy*, 801 F.2d at 436 (internal citations omitted), as well as whether the agency order "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a consummation of the administrative process." *Fidelity Television, Inc. v. Federal Communications Comm'n*, 502 F.2d 443, 448 (D.C.Cir.1974).

Whether an agency's assertion of jurisdiction or authority is a final action has been the subject of much debate. In *Federal Trade Comm'n v. Standard Oil Co. of Cal.*, the FTC issued a complaint against Standard Oil Company ("Socal") and other major oil companies, alleging that it had "reason to believe" the companies were violating § 5 of the Federal Trade Commission Act. 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). SOCAL filed a complaint against the FTC in the District Court for the Northern District of California, alleging that the FTC had issued its complaint without having "reason to believe" that SOCAL was violating the Act, and thus was acting in excess of its statutory authority. *Id.* at 235, 101 S.Ct. at 490–91. The Supreme Court held that "the averment of reason to believe is not 'definitive' in a comparable manner to the regulations in Abbott Laboratories and the cases it discussed," and merely represented a threshold determination that further inquiry was warranted. *Id.* at 241, 101 S.Ct. at 494. The Court held that the issuance of a complaint is merely a determination that adjudicatory proceedings will commence in order to determine whether there was in fact a violation, and thus not a "final action." *Id.* at 241, 101 S.Ct. at 493–94.

In *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, the Consumer Product Safety Commission initiated an administrative proceeding to assess a penalty for Athlone's alleged violation of the Consumer Product Safety Act. 707 F.2d 1485, 1487 (D.C.Cir. 1983). Athlone brought suit in the District Court to enjoin the administrative proceeding, claiming that the agency lacked jurisdiction to assess penalties in an administrative proceeding. *Id.* The District Court dismissed the complaint, reasoning that Athlone had failed to exhaust its administrative remedies and that the case was not ripe for review. *Id.* On appeal, the Court of Appeals considered whether the exhaustion doctrine required Athlone to go through with the administrative adjudication before seeking judicial review, holding that exhaustion was not required. *Id.* at 1489. The court pointed to the fact that the issue was strictly legal, no factual development or application of agency expertise would aid the court's decision, and a decision by the court would not invade the field of agency expertise or discretion. *Id.* In the court's view, a controversy presents issues on which courts and not administrators are more expert when the only dispute relates to the meaning of a statutory term. *Id.* at 1489.[5] In a footnote, the court

---

5. In *Athlone,* the Court acknowledged that there were unique circumstances in the case which made application of the exhaustion doctrine particularly inappropriate. 707 F.2d at 1489. A co-defendant in the administrative proceedings had been relieved from participating in the proceed-

ing by an Eighth Circuit injunction. *Id.* The Court of Appeals for the District of Columbia Circuit stated that it would be unfair and incongruous to require Athlone to take part in the administrative proceeding when its co-respondent had been relieved of the obligation due to a

stated that the Supreme Court's holding in *FTC v. Standard Oil Co.* was not controlling. 707 F.2d at 1489 n. 30.

In *Atlantic Richfield Co. v. United States Dept. of Energy*, the Atlantic Richfield Company ("Arco") was involved in two separate agency proceedings involving charged violations of petroleum price-control violations. 769 F.2d at 777. In each proceeding, one of the defenses which Arco asserted was good faith reliance on its interpretation of the applicable regulations. *Id.* The Department of Energy's prosecutorial branch thus sought evidence relating to Arco's corporate state of mind regarding the regulations. *Id.* Arco asserted that some of the requested documents were covered by the attorney-client and work-product privileges. *Id.* The Department's Office of Hearings and Appeals granted discovery motions against Arco in both proceedings. *Id.* In one proceeding, it stated that if the discovery orders were not complied with, Arco would be precluded from relying upon any affirmative defense which placed its corporate state of mind in issue. *Id.* at 777–78. In the other proceeding, it issued sanctions permitting adverse inferences to be drawn regarding Arco's corporate state of mind. *Id.* at 778. Arco challenged the agency's jurisdiction over alleged price-control violations, as well as its authority to impose remedial sanctions upon parties disobeying its discovery orders in those proceedings. *Id.* at 774–75.

The Court of Appeals first held that exhaustion was not required because resort to the agency would in all likelihood be futile since it was highly unlikely that the agency would change its position if the case were remanded to it. *Id.* at 782. Next, the court found that the issues were ripe for decision, because, again, the issues were essentially legal, and the administrative acts were sufficiently final for review.[6] *Id.* at 783.

The court also found the hardship prong satisfied in that Arco had already been faced with the dilemma of having to choose between complying with allegedly ultra vires discovery orders, and thus revealing materials that otherwise would remain confidential, and flouting the Department's orders and facing the consequences should the Department ultimately be found to have had the power to issue the orders."[7] 769 F.2d at 783–84. Balancing the questions as to the "legality of the Department's procedures, the strong public interest in early resolution of those questions, and the impossibility of finally settling them administratively," the Court ruled that the issues were ripe for review. *Id.* at 784.

In *Aluminum Co. of Am. v. United States,* the Aluminum Company of America ("Alcoa") challenged the Interstate Commerce Commission's ("ICC") assertion of original jurisdiction over its rail transportation rate claims. 790 F.2d 938, 940 (D.C.Cir.1986). Under the Staggers Rail Act, a state could regulate intrastate rail commerce if the ICC certified that the relevant state agency followed standards and procedures in accord with those followed by the ICC. *Id.* at 939. Under this system, railroads had the right to obtain prompt ICC review of decisions of the certified state authorities to ensure that proper standards and procedures had been followed. *Id.*

The ICC provisionally certified the Railroad Commission of Texas ("RCT"). *Id.* at 940. After issuing repeated warnings to the RCT that its application for final certification would be denied unless it brought its stan-

---

"coordinate federal court's resolution of the identical issue presented" to the D.C. Circuit. *Id.* at 1489. The court held that exhaustion was not required due to the "desirability of avoiding such unfairness, the purely legal nature of the issue presented, and the likely futility of further resort to the Commission." *Id.* at 1489.

It is, however, unclear whether this consideration played a critical role in the court's determination.

**6.** Regarding its finding that the agency's actions were sufficiently final, the Court pointed out that

the agency had promulgated regulations providing for the imposition of the contested sanctions, and that by subjecting Arco to adjudicatory proceedings the Department had "for all practical purposes, made a final determination that such proceedings [are] within its statutory jurisdiction." 769 F.2d at 783 (internal citations omitted).

**7.** This hardship appears to be one with which any party subject to agency adjudications would be faced.

dards and practices into conformity with those followed by the ICC, the ICC denied the RCT's request for final certification. *Id.* The ICC announced that it would assume original jurisdiction over all intrastate rail rate matters pending before the RCT as of May 20, 1984, one month from the announcement. *Id.*

On May 14, 1984, the RCT entered a judgment to take effect on May 19th on claims filed before it by Alcoa. *Id.* On June 21, 1984, a railroad company filed a petition for ICC review of the RCT decision. *Id.* The ICC ruled that Alcoa's rate claims had been pending before the RCT as of May 20th, and thus the ICC had original, not review, jurisdiction over the claims. *Id.* Alcoa challenged the ICC's assumption of original jurisdiction. *Id.*

The Court of Appeals held that the Interstate Commerce Commission's assertion of original jurisdiction was not the sort of " 'deprivation of a right' or 'imposition of an obligation' that constitutes final action," and that the fact that Alcoa's claim challenged the agency's statutory authority did not make the assumption of jurisdiction any more "final." *Id.* at 941–42. The court likened the ICC's action to an agency decision to undertake reconsideration of a final judgment of one of its administrative law judges. *Id.* at 941. In the view of the court, the agency action denied Alcoa, at most, of the procedural advantages attendant to the statutory less-than-de novo ICC review of RCT decisions, and refused to review the ICC's action on the grounds that it was not final agency action. *Id.* at 942.

The Court finds *Athlone* and *Atlantic Richfield* to be controlling in the instant case. This is not a case like *Standard Oil* where

the agency simply made an initial statutorily authorized determination that the oil companies might have violated the Federal Trade Commission Act, and thus that further inquiry was required. In the present case, the PTO has taken a final position that it has authority under 35 U.S.C. § 251 not only to consider Hydril's reissue application without the consent of Baker Hughes, an assignee of record, but also to hold the bifurcated proceedings to determine inventorship.

This also is not a case like *Alcoa.* As then Judge Scalia pointed out, *Alcoa* involved, at most, the abridgement of procedural rights in a proceeding over which the ICC unquestionably had some jurisdiction. It appears that the ICC would have had jurisdiction over the rate claim if it had not provisionally authorized RCT to adjudicate such claims. In addition, since a railroad company had appealed the RCT rate decision to the ICC, the claims were going to be reviewed by the ICC regardless of whether it asserted original jurisdiction. The only difference was that if the ICC had not asserted original jurisdiction, it would have given the rate decision the statutory less than de novo review. Due to its assertion of original jurisdiction, the review was de novo. Thus, the real challenge was not to the ICC's assertion of any jurisdiction over the claims, but rather was to the standard under which the ICC could review the claims. *Id.* at 942.

In consideration of the facts that the issue presented in this case is essentially legal, the Court's review will not benefit from further factual development within the agency, and the agency's position is final, it is evident that the issue of whether the PTO's actions are in violation of the agency's statutory authority is fit for review.[8]

---

8. While not critical to the Court's analysis, Baker Hughes asserts that it will suffer two hardships if this Court denies review. First, it will have its rights in the '999 Patent determined in an *ex parte* proceeding. This assertion is questionable. The PTO asserts that its proceeding will be a limited inter partes proceeding.

Second, Baker Hughes asserts if the Court denies review now, the issue will never be reviewable. In support of its position, Baker Hughes points to the fact that it is being treated as a "protestor" in the reissue proceedings, and thus will have no right to judicial review of the

PTO's reissue proceedings due to the holding in *Hitachi Metals, Ltd. v. Quigg,* 776 F.Supp. 3 (D.D.C.1991). Whether there is merit to this assertion is uncertain. In *Hitachi,* the District Court found that the government proved by clear and convincing evidence that the patent statutory scheme implemented by Congress was meant to preclude judicial review of reissue proceedings at the request of third party protestors. It appears that *Hitachi* is distinguishable from the instant case in that *Hitachi* involved an appeal by a third party protestor, not by an assignee of record

## III

■ In addressing the merits of plaintiff's claim that the PTO's actions are contrary to law, and the PTO's claim to the contrary, that its actions fall within its statutory powers, the Court must first consider whether Congress has directly spoken to the precise question at issue. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the statute speaks to this question, this Court's inquiry is at an end. *American Scholastic TV Programming Found. v. Federal Communications Comm'n*, 46 F.3d 1173, 1178 (D.C.Cir.1995). The deference traditionally given to an agency interpretation of a statute is not applied when that interpretation would alter the clearly expressed intent of Congress. *See Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1425 (Fed.Cir. 1988) (courts must "reject administrative constructions of the statute … that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement").

■ The Court first looks to the language of the statute. In construing a statute, "unless otherwise defined, words will be interpreted as taking their ordinary contemporary, common meaning." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426 (Fed.Cir.1988) (internal citation omitted). The language of 35 U.S.C. § 251, given its ordinary contemporary meaning, leaves no gap or ambiguity regarding who may apply for reissue of a patent. The statute clearly states that an "application for reissue may be made and sworn to by the assignee of the *entire* interest" in the patent. 35 U.S.C. § 251 (emphasis added). The parties do not dispute that both Baker Hughes and Hydril are assignees

of record. Thus, the PTO's decision to consider the reissue application of Hydril without the consent of Baker Hughes is contrary to the plain language of the statute.

In determining whether Congress' intent is clear, the Court must also consider the design of the statute. *City of Cleveland v. United States Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1366 (D.C.Cir.1995); *American Scholastic TV Programming Foundation v. Federal Communications Comm'n*, 46 F.3d at 1178. The patent statutes indicate Congress' intent to protect the interests of patent holders. The § 251 reissue statute protects the interests of patent holders by requiring that if an application for reissue is to be filed by an assignee, it must be by the assignee of the entire interest.

The PTO tries to justify its proposed procedures with the claim that by holding proceedings to determine who is the true inventor, and thus who is the true assignee of the patent, it is simply determining whether Hydril is the assignee of the entire interest in the patent. However, Congress specifically addressed the issue of what procedures are to be followed when one party claims that it is the true holder of the patent, and that another party has been misjoined as an inventor in the patent, when it promulgated 35 U.S.C. § 256.[9] Principles of statutory construction dictate that "unless there is clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Telecommunications Research and Action Ctr. v. Federal Communications Comm'n*, 836 F.2d 1349, 1361 n. 25 (D.C.Cir.1988) (internal citations omitted). The PTO's claim

---

being treated as a third party protestor by the PTO.

9. 35 U.S.C. § 256 states:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part the Commissioner may, on application of *all the parties and assignees*, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

35 U.S.C. § 256 (emphasis added).

**810**

would render § 256 a nullity, and thus cannot be accepted.[10]

Finally, the Court must consider the legislative history to see if it calls the apparent clarity of the statutory language into question. *Building and Constr. Trades Dep't, AFL–CIO v. United States Dep't of Labor Wage Appeals Bd.,* 932 F.2d 985, 990 (D.C.Cir.1991). Upon review of the legislative history, the Court finds nothing which contradicts, or calls into question, the apparent clarity of the statutory language. Because Congress directly spoke to the question at issue, the Court's inquiry is at an end. The PTO was bound to follow the statutory requirement that a reissue application, if made by an assignee, must be made by the assignee of the entire interest in the patent.

### IV

In sum, the PTO exceeded its statutory authority when it decided to proceed with Hydril's § 251 reissue application using the bifurcated procedure. Accordingly, plaintiffs' motion for summary judgment will be granted, and defendant's motion to dismiss will be denied. The matter will be remanded to the PTO for action in accordance with the Court's opinion. An Order is being issued contemporaneously herewith.

---

**10.** The PTO also tries to justify its actions by claiming that as § 251 is remedial in nature it should be liberally construed to grant authority to the PTO to determine inventorship and whether misjoinder of inventors has occurred. However, "the fact that the intent of the reissue provision is remedial does not permit avoidance of plain statutory language." *In re Morgan,* 990 F.2d 1230, 1232 (Fed.Cir.1993). Moreover, the cases cited by the PTO in support of its position are of no avail it because in none of the cases cited by the PTO were individual property rights affected. *See, e.g., A.F. Stoddard & Co. v. Dann,* 564 F.2d 556 (D.C.Cir.1977) (§ 251 procedure allowed to be used to substitute correct name of inventor for incorrect name when the assignee of entire interest in patent made the application for reissue and all parties having interest in the issued patent were diligent in efforts to correct the error once discovered). In the instant case, if the PTO were allowed to follow its proposed procedure, it would be determining, and possibly terminating, Baker Hughes' property rights in the '999 Patent without following the procedures envisioned by Congress when it enacted the statutory scheme.